## ATWATER v. HASSETT *et al.*

No. 2061.　Opinion Filed October 26, 1910.

(111 Pac. 802.)

1. **STATUTES—Constitutional Law—Elections — Amendments to Constitution—Initiative—Titles of Statutes.** (a) An act entitled "An act carrying into effect provisions relating to the initiative and referendum; prescribing the method of procedure for submitting and voting for proposed amendments to the Constitution and other propositions, and prescribing the method of appeal from petitions filed or from the ballot title; repealing sections 6, 7, and 16 of article 1, chapter 44, of the Session Laws of Oklahoma .1907-08," is not repugnant to section 57 of article 5 of the Constitution.

(b) Said act is neither repugnant to sections 2 and 3 of article 5 of the Constitution, nor sections 1 and 3 of article 24, of the Constitution of this state.

(c) Section 4 (a) of article 3 of the Constitution, an amendment adopted at the election on the first Tuesday in August, A. D. 1910, is not invalid for the reason that it was submitted at the primary election held "throughout the state," at said time, and not at the general election to be held "throughout the state," for the election of state officers on the second Tuesday of said year.

(d) Said section 4 (a) of article 3, supra, is neither repugnant to sections 1 and 7 of article 3, nor section 6, art. 1, or any other provision of the Constitution.

2. **CONSTITUTIONAL LAW—Elections—Equal Protection of Laws —Rights and Immunities.** (a) Said section 4 (a), art. 3, Const. supra, is neither in violation of the fourteenth nor the fifteenth amendment to the federal Constitution.

(b) Nor is said provision invalid on account of the following provision in section 3 of the Enabling Act:

"* * * The Constitution shall be republican in form, and make no distinction in civil or political rights on account of race or color, and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence."

Kane, J., dissenting in part.

(Syllabus by the Court.)

*Error from District Court, Oklahoma County; John J. Carney, Judge.*

Action between Joseph Atwater and W. T. Hassett and others. From the judgment, Atwater brings error.     Affirmed.

*Wiley Jones,* for plaintiff in error.

*C. B. Stuart* and *W. A. Ledbetter,* for defendants in error.— Citing: *Cook v. State of Tennessee,* 13 L. R. A. 183; *May & Thomas Hardware Co. v. Mayor, etc., of Birmingham,* 123 Ala. 306; *Minor v. Happersett,* 21 Wall. 162; *Williams v. Mississippi,* 170 U. S. 220.

*Burford & Burford* and *Devereux & Hildreth,* amici curiae. —Contending, *inter alia,* that the amendment in question is in conflict with the fourteenth and fifteenth amendments of the Constitution of the United States: *Wiley v. Sinkler,* 179 U. S. 58; *Swofford v. Templeton,* 185 U. S. 487; *Ex parte Yarbrough,* 110 U. S. 651; *Carey v. Carter,* 48 Ind. 327; *State v. Schlitz Brewing Co.,* 104 Tenn. 715; *Yick Wo v. Hopkins,* 118 U. S. 356; *Pope v. Williams,* 193 U. S. 621; *Railway Co. v. Mathews,* 174 U. S. 105; *Pembia, etc., Co. v. Pennsylvania,* 125 U. S. 181; *Lyman v. Martin,* 2 Utah, 145; *Home Ins. Co. v. People,* 134 U. S. 594; *Maxwell v. Dow,* 176 U. S. 581; *Ho Ah Kaw v. Nunan,* 5 Sawy. 552; *Ex parte Garland,* 4 Wall. 333.

WILLIAMS, J.     The following questions are raised:     (1) Is section 4 (a) of article 3 of the Constitution, as adopted at the election on the first Tuesday in August, A. D. 1910, invalid for the reason that said amendment was submitted at the primary election held "throughout the state" at said time, and not at the general election to be held "throughout the state," for the election of state officers on the second Tuesday of November in said year, and was not submitted under any valid procedure for the amendment of said Constitution?     (2) Is said provision in violation of the fourteenth or fifteenth amendments of the federal Constitution, or section 3 of the Enabling Act?

1.     Said amendment was submitted by virtue of the act of March 17, 1910 (Sess. Laws 1910, pp. 124, 125). This court, in *Re State Question No. 10,* 26 Okla. 554, 110 Pac. 647, held that said act became effective on the date of its passage and approval by

the Governor. It is urged; however, that the title of said act is violative of section 57 of article 5 of the Constitution, and for that reason said act falls. The title of said act relates primarily to one subject only, namely, the "carrying into effect provisions relating to the initiative and referendum" (Const. art. 5, § 58) by prescribing the method of procedure for submitting and voting for amendments to the Constitution and other propositions under such initiative and referendum powers and a method of appeal from the action of the Secretary· of. State relative to the ballot title, etc.; and repealing sections· 6, 7, 16, of article 1, c. 44, Sess. Laws 1907-08, which were a· part of the act· of that session to "carry into effect the initiative and referendum provisions." This title appears not to be repugnant to article 5, § 57, of the Constitution. *State ex rel. v. Hooker, County Judge*, 22 Okla. 712, 98 Pac. 964; *Rea, County Clerk, v. Board of County Com'rs., infra.* It is further urged· that· said amendment is invalid for the reason that it ·was submitted by virtue of sections 1, 2 and 4, art. 2, of said act (Sess. Laws 1910, p. 124), which provides:

"Section 1. If the Legislature should desire to ascertain the sentiment of the people upon any proposed amendment to the Constitution, it may, by concurrent resolution, suggest to the citizens of the state such proposition as an amendment to the Constitution. Such resolution shall set forth the proposed amendment in full and should the citizens of the state proceed to initiate such proposition within one year thereafter, then it shall be the duty of the Secretary of State, when the required petitions have been filed in· his office to cause an attached copy thereof to be filed with the chairman of the state election board, together with a certificate of the· fact that the proposition was originated by concurrent resolution of the Legislature setting forth such resolution.

"Section 2. All propositions first suggested to the people by the Legislature, as provided by section 1 of this article, shall be printed by such election board; and they shall have the supervision of the printing of the ballots for such proposed amendment, and such proposition shall be printed either on a separate and independent ballot or· upon the ballot upon which the names of candidates appear, should such election occur upon the day when

candidates are being voted for. Provided, however, that the state election board shall not be empowered to change the form of any ballot as prescribed by the Legislature. Should such title be printed upon ballots containing the names of candidates, such board shall cause such proposition to appear immediately following the names of such candidates. If separate ballots are used at each election for county candidates, only local propositions can be printed thereon. All statewide or district propositions shall be printed only upon the state ballots. Such election board shall cause the said title of each proposition to be printed, followed by the words 'For the Amendment,' which words shall be in a separate paragraph and at least one-fourth of an inch below such title. Said words shall have no distinguishing marks about them."

"Sec. 4. Electors shall vote upon all propositions submitted under the provisions of this act, and which were first suggested by concurrent resolution of the Legislature, in the following manner: Should the elector desire to vote for the proposed amendment, he shall leave the words 'For the Amendment,' intact without erasing same. But should he desire to vote against such proposition, he shall strike out the words, 'For the Amendment,' with a pencil mark. When such words are so erased after any proposition, the ballot shall be recorded as having been cast against the same, and whenever they are not so erased, such ballot shall be recorded as having been voted for such proposition."

Section 3 of article 5 of the Constitution provides:

"All elections on measures referred to the people of the state shall be had at the next election held throughout the state, except when the Legislature or the Governor shall order a special election for the express purpose of making such reference."

Section 1, art. 3, p. 270, Sess. Laws, 1909, provides:

"Whenever any measure shall be initiated by the people in the manner provided by law, or whenever the referendum shall be demanded against any measure passed by the Legislature, the Governor shall have the power, in his discretion, to call a special election to vote upon such question."

Section 1 of article 24 of the Constitution provides:

"Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall,

with the yeas and nays thereon, be entered in their journals and referred by the Secretary of State to the people for their approval or rejection, at the next regular general election, except when the Legislature, by two-thirds vote of each House, shall order a special election for that purpose. If a majority of all the electors voting at such election shall vote in favor of any amendment thereto, it shall thereby become a part of this Constitution. If two or more amendments are proposed they shall be submitted in such manner that electors may vote for or against them separately."

Section 3 of article 24 provides:

. "This article shall not impair the right of the people to amend this Constitution by a vote upon an initiative petition therefor."

This amendment not having been submitted by virtue of section 1, art. 24, *supra,* the same has no application to this case. Said amendment was submitted on an initiative petition. Under section 3, art. 5, Const., said amendment was required to be submitted "at the next election held throughout the state." Further, the Governor issued his proclamation calling an election for said date at which said proposed amendment was to be submitted.

It has been time and again held by this court that the initiative and referendum provisions as contained in the Constitution of this state are not self-executing. *Ex parte Wagner,* 21 Okla. 33, 95 Pac. 435; *Norris et al. v. Cross,* 25 Okla. 287, 105 Pac. 1000; *Threadgill et al. v. Cross,* 26 Okla. 403, 109 Pac. 558; *In re Initiative State Question No. 10,* 26 Okla. 554, 110 Pac. 647. Was said amendment submitted in a manner contrary to some provision of our Constitution? It was provided that there should be printed upon the ballot, "For the Amendment," and those desiring to vote in favor of the amendment should vote the ballot in that form, and those desiring to vote against it should strike out the words, "For the Amendment," with a pencil mark. Section 7 of article 3 of the Constitution provides that elections in this state "shall be free and equal." A similar provision was contained in the Constitutions of Pennsylvania (Const. 1838, art. 9, § 5; Const. 1873, art. 1, §

5), Oregon (Const. 1857, art. 2, § 1), and Illinois (Const. 1870, art. 2, § 18).

In *Patterson v. Barlow,* 60 Pa. 54, it is said:

"The Constitution appoints the time of the general election, prescribes the qualifications of voters, and enjoins the ballot; and for the rest the law must provide. * * * Then that election is free and equal where all the qualified electors of the precinct are carefully distinguished from the unqualified, and are protected in the right to deposit their ballots in safety, and unprejudiced by fraud."

At *nisi prius* Judge Sharswood (60 Pa., at page 63) said:

"I propose to consider what was meant both by the freedom and the equality of elections, and then apply the declaration of the Constitution as thus interpreted to the act of Assembly, the validity of which is now brought in question. By declaring that elections shall be equal, I think that it was evidently intended to provide that the regulations for conducting them should be uniform, and that no distinctions, especially as to the evidence required to prove the elective franchise, should ever be made between one class of citizens and another—between those residing in one place and those residing in another. If equality of elections does not mean this, it means nothing."

This identical language is quoted with approval in *Grinnell v. Hoffman,* 116 Ill. 587, 5 N. E. 596, 8 N. E. 788, 56 Am. Rep. 793.

In *De Walt v. Bartley,* 146 Pa. 529, 24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814, Chief Justice Paxson, in delivering the unanimous opinion of the court, said:

"The act provides for a secret ballot. That is manifestly its main purpose, and it is in entire harmony with article 1, § 5, Const., which declares that 'elections shall be free and equal.' This means that every citizen shall have an equal right to cast a free ballot. This is the letter of the Constitution, and it is a right which no Legislature can interfere with. The spirit of the Constitution requires that each voter shall be permitted to cast a free and unintimidated ballot. This the act of 1891 was intended to secure. An election, to be free, must be without coercion of every description. An election may be held in strict accordance with every legal requirement as to form, yet if, in point of fact,

the voter casts the ballot as the result of intimidation; if he is deterred from the exercise of his free will by means of any influence whatever, although there be neither violence nor physical coercion—it is not a free and equal election, within the spirit of the Constitution. The framers of the act in question have evidently reached the conclusion that the only adequate guaranty of free and equal elections, within the letter and spirit of the Constitution, is absolute secrecy. They therefore have provided a secret ballot."

In *State ex rel. v. Richardson*, 48 Or. 309, 85 Pac. 225, 8 L. R. A. (N. S.) 362, it is said:

"It is maintained that the act under consideration is violative of section 1, art. 2, of the organic law of the state, which is as follows: 'All elections shall be free and equal.' No qualified elector was prevented by any means whatever, so far as disclosed by the transcript, from freely voting to adopt or reject the local option law, or deprived of having his vote counted as cast, and, if he exercised the right of suffrage on this particular occasion, his opportunity was equal to that of all other persons voting, and hence the act does not contravene the clause of the Constitution invoked to defeat it. 10 Am. & Eng. Enc. Law (2d Ed.) 583."

This identical question seems to have been passed upon by the Supreme Court of Alabama, which had substantially the same constitutional provision as existed in Oklahoma. Section 2 of article 1 of the Alabama Constitution of 1875 provides:

"That all persons resident in this state, born in the United States, or naturalized, or who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the state of Alabama, possessing equal civil and political rights."

Section 38 of the same article further provides:

"No educational or property qualification for suffrage or office, nor any restraint upon the same, on account of race, color, or previous condition of servitude, shall be made by law."

Section 1, art. 17, provides:

"The General Assembly may, whenever two-thirds of each House shall deem it necessary, propose amendments to this Constitution, which, having been read three times on three successive

days, shall be duly published, in such manner as the General Assembly may direct, at least three months before the next general election for representatives, for the consideration of the people; and it shall be the duty of the several returning officers, at the next general election which shall be held for representatives, to open a poll for the vote of the qualified electors on the proposed amendments, and to make a return of said vote to the Secretary of State; and if it shall thereupon appear that a majority of all the qualified electors of the state, who voted for representatives, voted in favor of the proposed amendments, said amendments shall be valid to all intents and purposes as parts of this Constitution, and the results of such election shall be made known by proclamation of the Governor."

In *May & Thomas Hardware Co. v. Mayor, etc., of Birmingham*, 123 Ala. 306, 26 South. 537, the late Chief Justice McClellan, in delivering the unanimous opinion of the court, said, after having quoted at length section 1, art. 17:

"Under and in supposed conformity to this organic provision, the General Assembly of 1896-97 passed 'An act to submit to the people of the state at the general election to be held on the first Monday in August, 1898, for representatives, for their consideration, an amendment to section seven, article eleven of the Constitution, providing a special tax of one-half of one per centum for the city of Birmingham, to be applied to the payment of interest on the bonds of said city and for a sinking fund to pay off said bonds at the maturity thereof' [Laws 1896-97, p. 1202]. * * *

"The position of the appellant, as we understand it, is that section 3 of the act is unconstitutional and void, and that, of consequence, the amendment declared to have been adopted at the election held under it is likewise void, for that: First, that section violates the spirit and purpose of section 1 of article 17 of the Constitution, quoted above, which requires to the validity of an amendment that a majority of all the qualified voters voting at the election shall vote in favor of the proposed amendment; and, second, that the statute, or rather said section 3 thereof, is violative of section 1 of article 8 of the Constitution, which prescribes the qualifications of electors, and guarantees to every citizen possessing the prescribed qualifications the right to vote at every election by the people. And the argument in support of the

first proposition is, in the brief of appellant's counsel, thus epitomized: '(a) Under the provisions of the statute, the amendment might be declared adopted, although a majority of all the qualified voters of the state who voted at the election had no intention, when they voted for state and county officers, to vote upon the proposed amendment, or did not manifest any intention to vote for tne amendment, or desired to refrain from voting on the proposition. (b) The provisions of the statute render it impossible to ascertain with certainty whether a majority of all the electors of the state who voted at the election actually and affirmatively voted for the amendment, within the spirit and meaning of the Constitution. (c) The Constitution requires positive, affirmtive action on the part of the elector to manifest an intention to vote in favor of the amendment, and no action to manifest an intention to vote against it. This statute requires positive, affirmative action on the part of the elector to manifest an intention to vote against the amendment, and no affirmative action to manifest an intention to vote in favor of it. (d) The Constitution presumes that every elector who votes for any state or county office at the election, but fails to vote, or for any reason refrains from voting, on the proposition to amend, is against the amendment, and, in effect, requires his ballot for state and county offices to be counted as a vote against the amendment. This statute assumes that every elector who does not wish to vote directly against the amendment by striking out the words, "For Birmingham Amendment," will vote in favor of it, and requires his ballot to be counted in favor of the amendment although he may have had no intention to vote in favor of it, or any knowledge that any such proposition was pending to be voted on.'

"It may well be assumed that the foregoing skeleton of counsel's argument presents every consideration worthy of attention against the validity of this statute under section 1 of article 17 of the Constituton. Certainly no other plausible objection to its integrity occurs to us; and upon the positions taken by them we will consider this part of the case. In the outset it is, of course, to be admitted that it is essential to the adoption of any proposed amendment to the Constitution, that a majority of the electors voting at the election at which the proposition is submitted should vote for the amendment. That is the plain requirement of the organic law; and, of course, any statute which undertook to provide for the adoption of such an

amendment upon a less number of favoring votes than a majority of those so voting, or which made it possible, in legal contemplation, for the amendment to rest upon the favoring votes of a minority of the electors so voting, would be violative of the Constitution and void. It is further to be taken for granted that a vote for a proposition necessarily implied the expression of the voter's opinion, position or preference in favor of or for that proposition; and a statute which authorizes or admits of the counting for a proposed amendment to the Constitution a ballot which does not involve, directly or by necessary implication, such expression favorable thereto, would be invalid and of no effect. And so the inquiry in this connection is whether this statute authorizes or admits of the counting for this amendment of ballots which can be said not to evidence the voters' predilection for and intention to support the amendment, or, rather, which cannot be said to manifest such predilection and intention. We do not think the enactment authorizes or admits of any such thing. Every voter is presumed to know what is on any ballot he deposits as an expression of his will upon men and measures submitted for his consideration and action as an elector. Every voter who can read does know what his ballot contains. And the law furnishes the illiterate voter with easy and convenient means of information as to what his ballot contains, and when he deposits it, the presumption of law is that he, as well as his educated fellow elector, knows what is upon it, and has expressed the desire as between candidates and upon propositions which the paper indicates. This presumption of law is absolutely essential to popular government. The presumption is indulged, because every practical means has been resorted to to acquaint the voter with the contents of his ballot, and he in fact does know its contents. If the fact were otherwise, the presumption could not exist, and government by ballot would be impossible. Until within a few years past it was, and for long had been, under the present and former Constitutions, the law and practice for the names of only a certain set of candidates, the nominees of a political party, to appear upon a ballot. The voter who deposited such a ballot, without erasing any of the names upon it, thereby expressed his choice of all the persons whose names so appeared. If he wished not to vote for any person on the ticket, he could do so only by striking out that name. If he wished to vote for a person for a particular office whose name did not appear on the ballot, he would have to strike out the can-

didate for that office whose name did appear, and substitute the name of the person of his choice. If he erased no name, he was conclusively presumed to have voted for every person on the list. Or when there had been no party nominations, and all candidates for a given office appeared on the same ballot, as frequently occurred, the voter had to erase the names of all the candidates except the one for whom he intended to vote; and if he left all the names on the ballot, he was held to have voted for the person whose name first appeared thereon; and, that all candidates might have equal advantage in view of the law on this point, it was the custom to give priority on the ballot to each on an equal number of tickets, so that if A. B. and Y. Z. were candidates for an office, and 1,000 tickets were printed, the name of A. B. would appear first on 500 tickets, and that of Y. Z. would appear first on the remaining 500. And, where there was a party ticket, and no erasure upon it, the conclusive presumption of law was that the voter intended to vote for every person whose name appeared to fill the office for which he was a candidate, as indicated by the ticket; or, in other words, that he knew all that the ticket contained, and adopted it as the expression of his views, and there was really never any question of fact as to whether such tickets actually represented the intent of the voters—they always did. So where the names of two or more candidates for the same office appeared, and there was no erasure, the law held the voter to a knowledge that, under the law, the first named person would be credited with having received his vote; and while, as we have seen, there was some notion abroad, under this provision of law and the practice, that in such case the person first named might be credited with votes which were not intended to be cast for him, or for the office at all, leading to the alternation of names through a series of tickets, yet it was never seriously questioned that such a ballot represented in point of fact the affirmative choice of the voter for the first named candidate. And such was the necessary and conclusive presumption of law based upon substantial uniformity of fact. Affirmative manifestation of the voter's intent was as essential then as it is now; and it was then, and is now, as essential in respect of the election of officers as it was then, and is now, in respect of propositions submitted to the electors. And it was then, and has always been, held that the necessary affirmative manifestation of intent is that manifestation which appears on the words of the ballot which the voter deposits, even when

those words take on a peculiar meaning from their colloca-
tion by sheer force of a statute of which the voter might be
entirely ignorant; and all this, regardless of the voter's il-
literacy. How much stronger, then, and more fully justified, is
the presumption when a voter casts a ballot upon which is printed
the information that an amendment to the Constitution is to be
voted upon, and that, if he deposits that ballot as it is, he ex-
presses his favor for the amendment, when, to state this case,
there is printed on the official ballot the words, 'For Birmingham
Amendment'—how much nearer to absolute certainty is the impli-
cation that when the voter casts that ballot he intends it as an
affirmative expression of his will, and that it is an affirmative
manifestation of his purpose to support and favor the amendment?
And this is all the Constitution in respect of the adoption of such
amendments requires: That the voter shall vote for the amend-
ment; that he shall favor the adoption of the amendment; and
that he shall deposit a ballot which, on its face, assuming knowl-
edge on his part of its contents, evidences his wish that the pro-
posed amendment should become part of the organic law. And
so, indulging this presumption, because it is justified by the facts
and is a *sine qua non* to government by the people, there is no
difficulty in ascertaining with the same certainty that has always
sufficed in elections whether a majority of the voters voting at the
election provided for in this act 'actually and affirmatively voted
for the amendment, within the spirit and meaning of the Con-
stitution.' Since the result is to be arrived at by counting for
the amendment all the ballots which have the words, 'For Birming-
ham Amendment,' intact upon them, and against it all those bal-
lots from which those words have been erased, there is no danger
of the adoption of the amendment being declared, although a ma-
jority of the voters had no intention to vote on or for the amend-
ment; but, to the contrary, the ballots themselves conclusively evi-
dence that manifestation of the voters' intention which the Con-
stitution requires. And this is all that the Constitution does re-
quire—a majority of the votes cast at that election for the amend-
ment. When there is such majority shown by affirmative ballots,
the Constitution is not concerned about the minority. If that
minority desired not to vote at all on the proposition, and so to be
counted against it, the fact that, under this act, they had to vote
one way or the other, had either to strike off the amendment, and
so vote against it, or to leave it on, and so vote for it, does not de-

stroy the integrity of the majority of the whole vote at that election who have in legal contemplation affirmatively expressed their favor for the amendment. The whole argument for appellant on this part of the case, it seems to us, is at fault, in assuming that the casting of a ballot upon which are printed the words, 'For Birmingham Amendment,' is not affirmative action on the part of the voter in favor of the amendment. That assumption being eliminated, the argument falls to the ground, and the conclusion we are asked, in this connection, to draw against the law, has nothing to rest upon.

"As part and in conclusion of our discussion of the case in this connection, we adopt an opinion upon it prepared by Judge R. W. Walker, at the instance of appellee's counsel. After stating the provisions of section 3 of the act, he says: 'The question submitted is: Is there anything in the Constitution of Alabama which prohibited the Legislature from making the regulation contained in said section in respect of the preparation of the ballot and the manner of voting? In other words, was it competent for the Legislature to prescribe that the words, "For Birmingham Amendment," should be printed on the official ballots, and to declare that the leaving of said words upon the ballot shall be taken as a favorable vote, and the erasure or striking out of said words shall be taken as an adverse vote upon said amendment? The extent of the requirements of the Constitution of Alabama touching the method of voting upon a proposed amendment of that instrument is the provision that all elections by the people shall be by ballot, and the provision for the opening of a poll for the vote of the qualified electors on the proposed amendment. These two provisions together amount simply to a requirement that a proposed amendment shall be submitted to the qualified electors of the state for their vote upon it by ballot. The Constitution expressly remits to the General Assembly the matter of regulating and governing elections by laws which are required to be uniform throughout the state. It cannot be doubted that the form of the ballot and the method of indicating the voter's choice are matters for legislative regulation. Of course, it would not be competent for the Legislature, under the guise of regulations, to effect a practical denial of the free exercise of the elective franchise. But there can be no question of a regulation really amounting to a deprivation of the right to vote, where the meaning of what is put upon the ballot required to be used by the voter is plain to

a common understanding, and the method prescribed for the indication of his choice by the voter is easy to be comprehended, and not difficult to be followed. It is certainly not unreasonable to assume that the voter is to inform himself of the contents of the ballot he casts, where the meaning is obvious to one who can read, and could not be misunderstood by an illiterate voter who seeks information as to what is upon the ballot put into his hands. The words, "For Birmingham Amendment," printed in a conspicuous place upon the ballot in question, plainly indicate a choice in favor of the amendment. A voter casting a ballot known to have these words upon it must have understood that he was thereby expressing himself in favor of the amendment. If he wished to vote against the proposed amendment, all that was required was the erasure or striking out with pen or pencil of those words. The method prescribed by the statute for the voter indicating his choice to vote for or against the amendment was simplicity itself, and, though that method varied from the one adopted in the recently enacted general election law, yet it was a method by no means unfamiliar to the electors of the state. As to the method of voting on this amendment, the Legislature simply revived the old way, familiar to the people of casting an adverse vote by "scratching the ticket." It seems that any suggestion against the validity of the provision in question must be based upon the assumption that it was not competent for the Legislature to make a provision in reference to the ballot which involves the possibility of a vote in favor of a person or proposition being the result of the voter's deliberate or negligent failure to inform himself of the contents of the ballot he casts and of the method prescribed by law for the indication of his choice. Any such assumption I regard as wholly unwarranted. Where the method of indicating his choice the one way or the other is plain and simple, the provision on the subject cannot be rendered invalid by the mere possibility that, as the result of the carelessness of the voter, his act in casting his ballot may have an effect not actually contemplated by him.'

"And so we conclude that the first objection to the act relied on, as stated in the beginning of this opinion by appellant's counsel, is untenable and unavailing.

"Of the second ground of objection to the act above stated little, we think, need be said. It is, to repeat, that 'the statute violates section 1 of article 8 of the Constitution, which fixes the

qualifications of voters, and guarantees to every citizen possessing these qualifications the right to vote at every election by the people.' And the argument is that, inasmuch as the Constitution does not require the elector to vote upon all offices to be filled at an election, but only in respect of such as he desires, and that, as is insisted, the same principle obtains in repsect of an amendment, so that the organic law contemplates that an elector voting for candidates for office may refrain from voting for amendments, this statute adds an additional qualification, in that it requires him to vote on this amendment as a necessary incident to his vote on offices, or, as said by counsel: 'The statute takes away from elector his right, recognized by the Constitution, to refrain from voting on the amendment, and at the same time to vote for the state and county offices to be filled at the election.' This position takes no account of the consideration that, under any possible form of submitting a proposed amendment to the people, every elector who votes for a state or county office at the election must, through the operation of the Constitution itself in effect, vote for or against the amendment. Article 17, § 1, provides, as we have seen, that an amendment must receive 'a majority of all the qualified electors of the state who vote at the general election to which it is submitted'—a majority, not of those who vote on the amendment, but of those who deposit ballots for any purpose. Hence it is that, if an elector votes for a state or county office, he necessarily votes on the amendment, for, though his ballot contains no reference to the amendment, he is counted against it. So that by the terms of the Constitution itself he is deprived of the right to refrain from voting on an amendment if he votes for any state or county office; and the statute cannot be violative of the Constitution for having this same operation and effect. The most that can be said of the statute in this connection is that, under it, it is easier for the elector to vote for the amendment than against it, in that to vote against it he is put to the physical exertion of drawing a pen or pencil through the words, 'For Birmingham Amendment,' and he may vote for it without doing this; and of this it is sufficient to say that such regulations have been several times, and we think correctly, held valid."

See, also, *Cook v. State,* 90 Tenn. 407, 16 S. W. 471, 13 L. R. A. 183; *Ransom v. Black,* 54 N. J. Law, 446, 24 Atl. 489, 16 L. R. A. 769; *Ritchie v. Richards,* 14 Utah, 345, 47 Pac. 670.

What is the difference between where the names of the nomi-

nees of a political party are placed upon a ballot, all of whom are to be voted for by placing a cross in the circle under the emblem, and the case at bar? The party that does not desire to vote a straight party ticket is required to place a cross in the square opposite the name of each person he desires to vote for. If the ballot form prescribed by said act of March 17, 1910, is invalid, the provision of law in this state permitting the party that desires to vote a straight party ticket to put a cross in the circle under the rooster, eagle or other party emblem to indicate his intention of thereby voting for all of said candidates, would be void, as the party who did not desire to vote a straight party ticket would have an additional burden placed upon him, and the election laws existing under the territory of Oklahoma, as well as such laws as now are in force, would be repugnant to the provisions of the Constitution.

This amendment was adopted by virtue of the initiative and referendum powers of the Constitution (sections 2 and 3, art. 5, and section 3, art. 24, Const. Okla.). The petitions were prepared, filed and submitted in accordance therewith. The initiative and referendum provision, not being self-enforcing (*Ex parte Wagner, supra*), legislation was essential. In cases where such amendments have been suggested by the Legislature by concurrent resolution, a certain form of ballot is prescribed. It having been especially committed to the Legislature to enact laws "for carrying into effect provisions relating to the initiative and referendum" (article 5, § 58, Const.), courts will not revise such discretionary powers. *State v. Shields,* 4 Mo. App. 259; *Okla. City v. Shields,* 22 Okla. 265, 100 Pac. 559; *In re Menefee, Treas.,* 22 Okla. 365, 97 Pac. 1014; *Rakowski v. Wagoner,* 24 Okla. 282, 103 Pac. 632; *State v. Brown, Judge,* 24 Okla. 433, 103 Pac. 763. Such form of ballot having been prescribed in the valid exercise of its legislative discretion, this court cannot revise same. Section 10, art. 1, c. 44, p. 447, Sess. Laws 1907-08, does not apply to said submission under the initiative and referendum.

Said amendment, having been legally adopted, seems to har-

monize with all the provisions of the Constitution of this state, unless it be section 6, of article 1. This section is merely declaratory of the fifteenth amendment to the federal Constitution, and will be considered under subdivision 2 of this opinion. As to all other provisions of the state Constitution, said provision appears to harmonize and to have been adopted in all respects in accordance therewith.

2. "* * * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (Section 1, art. 14, Amendment to the Federal Constitution.)

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color or previous condition of servitude." (Section 1, art. 15, Amendment to the Federal Constitution.)

Section 4 (a) of article 3, *supra,* provides:

"No person shall be registered as an elector of this state, or be allowed to vote in any election herein, unless he be able to read and write any section of the Constitution of the state of Oklahoma; but no person who was, on January 1, 1866, or at any time prior thereto entitled to vote under any form of government, or who, at that time, resided in some foreign nation, and no lineal descendant of such person shall be denied the right to register and vote because of his inability to so read and write sections of such Constitution. Precinct election inspectors having in charge the registration of electors shall enforce the provisions of this section at the time of registration, provided registration be required. Should registration be dispensed with, the provisions of this section shall be enforced by the precinct election officers when electors apply for ballots to vote."

In *Williams v. State of Mississippi,* 170 U. S. 220, 18 Sup. 583, 42 L. Ed. 1015, Mr. Justice McKenna, in delivering the unanimous opinion of the court, said:

"It is not asserted by plaintiff in error that either the Constitution of the state or its laws discriminate in terms against the negro race, either as to the elective franchise or the privilege or duty of sitting on juries. These results, if we understand plain-

tiff in error, are alleged to be effected by the powers vested in certain administrative officers. Plaintiff in error says: 'Section 241 of the Constitution of 1890 prescribes the qualifications for electors; that residence in the state for two years, one year in the precinct of the applicant, must be effected; that he is 21 years or over of age, having paid all taxes legally due of him for two years prior to 1st day of February of the year he offers to vote. Not having been convicted of theft, arson, rape, receiving money or goods under false pretenses, bigamy, embezzlement. Section 242 of the Constitution provides the mode of registration; that the Legislature shall provide by law for registration of all persons entitled to vote at any election; that all persons offering to register shall take the oath; that they are not disqualified for voting by reason of any of the crimes named in the Constitution of the state; that they will truly answer all questions propounded to them concerning their antecedents so far as they relate to the applicant's right to vote, and also as to their residence before their citizenship in the district in which such application for registration is made. The court readily sees the scheme. If the applicant swears, as he must do, that he is not disqualified by reason of the crimes specified, and that he has effected the required residence, what right has he to answer all questions as to his former residence? Section 244 of the Constitution requires that the applicant for registration after January, 1892, shall be able to read any section of the Constitution, or he shall be able to understand the same (being any section of the organic law) or give a reasonable interpretation thereof. Now, we submit that these provisions vest in the administrative officers the full power, under section 242, to ask all sorts of vain, impertinent questions, and it is with that officer to say whether the questions relate to the applicant's right to vote. This officer can reject whomsoever he chooses, and register whomsoever he chooses, for he is vested by the Constitution with that power. Under section 244 it is left with the administrative officer to determine whether the applicant reads, understands or interprets the section of the Constitution designated. The officer is the sole judge of the examination of the applicant, and, even though the applicant be qualified, it is left with the officer to so determine; and the said officer can refuse him registration.' To make the possible dereliction of the officers the dereliction of the Constitution and laws, the remarks of the Supreme Court of the state are quoted by plaintiff in error as to their in-

tent.    The Constitution provides for the payment of a poll tax, and by a section of the Code its payment cannot be compelled by a seizure and sale of property.    We gather from the brief of counsel that its payment is a condition of the right to vote, and, in a case to test whether its payment was or was not optional (*Ratliff v. Beale,* 74 Miss. 247, 20 South. 865, 34 L. R. A. 472), the Supreme Court of the state said: 'Within the field of permissible action under the limitations imposed by the federal Constitution, the convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race.'    And further, the court said, speaking of the negro race: 'By reason of its previous condition of servitude and dependence, this race had acquired or accentuated certain peculiarities of habit, of temperament, and of character, which clearly distinguishes it as a race, from that of the whites—a patient, docile people, but careless, landless and migratory within narrow limits without forethought, and its criminal members given rather to furtive offenses than to the robust crimes of the whites.    Restrained by the federal Constitution from discriminating against the negro race, the convention discrimnated against its characteristics, and the offenses to which its weaker members were prone.'    but nothing tangible can be deduced from this.    If weakness were to be taken advantage of, it was to be done 'within the field of permissible action under the limitations imposed by the federal Constitution,' and the means of it were the alleged characteristics of the negro race, not the administration of the law by the officers of the state.    Besides, the operation of the Constitution and laws is not limited by their language or effects to one race.    They reach weak and vicious white men as well as weak and vicious black men, and whatever is sinister in their intention, if anythng, can be prevented by both races by the exertion of that duty which voluntarily pays taxes and refrains from crime."

In *Pope v. Williams et al.,* 193 U. S. 621, 24 Sup. Ct. 573, 48 L. Ed. 817, Mr. Justice Peckham, in delivering the opinion of the court, said:

"The privilege to vote in any state is not given by the federal Constitution, or by any of its amendments.    It is not a privilege springing from citizenship of the United States. *Minor v. Happersett,* 21 Wall. 162, 22 L. Ed. 627.    It may not be refused on account of race, color or previous condition of servitude; but it does not follow from mere citizenship of the United States.

In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the federal Constitution. The state might provide that persons of foreign birth could vote without being naturalized, and, as stated by Mr. Chief Justice Waite in *Minor v. Happersett,* 21 Wall. 162, 22 L. Ed. 627, such persons were allowed to vote in several of the states upon having declared their intention to become citizens of the United States. Some states permit women to vote; others refuse them that privilege. A state, so far as the federal Constitution is concerned, might provide by its own Constitution and laws that none but native born citizens should be permitted to vote, as the federal Constitution does not confer the right of suffrage upon any one, and the conditions under which that right is to be exercised are matters for the states alone to prescribe, subject to the conditions of the federal Constitution, already stated; although it may be observed that the right to vote for a member of Congress is not derived exclusively from the state law. See Const. U. S. art. 1 § 2: *Wiley v. Sinkler,* 179 U. S. 58, 45 L. Ed. 84, 21 Sup. Ct. 17. But the elector must be one entitled to vote under the state statute. *Id., Id.* See, also, *Swafford v. Templeton,* 185 U. S. 487, 491, 46 L. Ed. 1005, 1007, 22 Sup. Ct. 783. In this case no question arises as to the right to vote for electors of President and Vice President, and no decision is made thereon. The question whether the conditions prescribed by the state might be regarded by others as reasonable or unreasonable is not a federal one. We do not wish to be understood, however, as intimating that the condition in this statute is unreasonable or in any way improper. We are unable to see any violation of the federal Constitution in the provision of the state statute for the declaration of the intent of a person coming into the state before he can claim the right to be registered as a voter. The statute, so far as it provides conditions precedent to the exercise of the elective franchise within the state, by persons coming therein to reside (and that is as far as it is necessary to consider it in this case), is neither an unlawful discrimination against any one in the situation of the plaintiff in error, nor does it deny to him the equal protection of the laws, nor is it repugnant to any fundamental or inalienable rights of citizens of the United States, nor a violation of any implied guaranties of the federal Constitution.

The right of a state to legislate upon the subject of the elective franchise as to it may seem good, subject to the conditions already stated, being, as we believe, unassailable, we think it plain that the statute in question violates no right protected by the federal Constitution. The reasons which may have impelled the state Legislature to enact the statute in question were matters entirely for its consideration, and this court has no concern with them."

See, also, *Franklin v. South Carolina*, 218 U. S. 161, 30 Sup. Ct. 640.

By this amendment, which was suggested by concurrent resolution of the Legislature of the state of Oklahoma and proposed by an initiative petition on the part of the qualified electors of said state, and afterwards adopted by a majority of the electors "voting at an election held throughout the state," and thereby declared by the Legislature, recommending and at least 15 per cent. of the qualified electors joining in said petition with a majority of those voting at said election, approving the same, that said limitations on the right of suffrage were reasonable and not violative of the federal or state Constitution. As was said in the Mississippil case, this amendment does not on its face discriminate between the races.

Limitations on the right of suffrage existed in the states on January 1, 1866, as follows: Connecticut (Const. 1836, art. 8, as adopted in 1845) : An elector to be qualified must "sustain a good moral character." Delaware (Const. 1831, art. 4) : Electors, with certain exceptions, must have for two years next before the election paid a county tax, which shall have been assessed for over six months prior to said election. Massachusetts (Const. 1780, art. 3, adopted in 1822, as supplemented by article 20 as adopted in 1857).: An elector, with a few exceptions, must have paid by himself, his parent, master, or guardian, any state or county tax, which shall have been assessed upon him, in any town or district of this commonwealth, and, in addition thereto, must be able to read the Constitution in the English language and write his name. Rhode Island (Const. 1842, art. 2, § 1) : An elector, with certain

exception, must be "really and truly possessed in his own right of real estate," in a town or city "of the value of $134.00 over and above all incumbrances, or which shall rent for $7 per annum over and above any rent, reserved or the interest of any incumbrances thereon," etc. And section 2 of said article further provides that electors to be qualified must also have paid "a tax or taxes assessed upon his estate within said state and within a year of the time of voting" to the amount of $1. Vermont (Const. 1793, c. 1, art. 8; chapter 2, art. 39, and article 1 of the amendment) : An elector was required to be of good moral character, and have a "sufficient," evident, common interest with, and attachment to, the community. Virginia (Const. 1864, art. 3, § 1) : An elector must have first "paid all taxes assessed to him."

In practically every state of the Union, on January 1, 1866, persons were disqualified from voting who had been convicted of infamous crimes, unless such disqualification had been removed, etc. In addition, an alien residing in this country on January 1, 1866, neither having become a naturalized citizen nor having declared his intention to become a citizen of the United States, was not entitled to vote in any of the states. At that time, there were many foreign governments where the right of suffrage did not exist in any way, and in nearly all others, where it existed at that time, it was with many limitations. Such alien residing in the United States on January 1, 1866, neither being entitled to vote in the place of his residence nor under any organized government where he had previously resided or been a citizen of, and his descendants, would also be subject to this educational qualification, coming within the excluded class as of the date of January 1, 1866. Further, the blanket Indians on January 1, 1866, had no organized form of government under which they might exercise the right of suffrage. The Cherokees, Chickasaws, Choctaws, Creeks, Osages, and Seminoles had such a government, and seem to have been the only tribes, the remnants of which now remain in this state, which had such a government.

Again, many states have similar existing suffrage limitations,

where the same have been enforced and recognized in the election of state officers and members of Congress: Const. Ala. 1901, § 180, pars. 1, 2; Const. La. 1898, art. 197, § 5; Const N. C. 1876, art. 6, § 1; Const. Va. 1902, § 19, pars. 1, 2 (Code 1904, p. ccxii). Maine has a provision (Amendment 29 adopted in 1892) as follows:

"No person shall have the right to vote or be eligible to office under the Constitution of this state, who shall not be able to read the Constitution in the English language and write his name; provided, however, that the provisions of this amendment shall not apply to any person prevented by a physical disability from complying with the requisitions, nor to any person who now has the right to vote, nor to any person who shall be sixty years of age or upwards at the time this amendment shall take effect."

In the Maine provision the educational requirement is not to apply to any person then having the right to vote. The Oklahoma provision, excluding from its operation persons having the right to vote on January 1, 1866, adopts the same principle, extending same so as to include their descendants.

Paragraph 3 of section 1, art. 7, Const. Minn. 1857, as amended November 3, 1868, provides as follows:

"Persons of Indian blood, residing in this state, who have adopted the language, customs and habits of civilization, after an examination before any district court of the state, in such manner as may be provided by law, and shall have been pronounced by said court capable of enjoying the rights of citizenship within the state, shall be entitled to vote."

In the following states, on and prior to the 1st day of January, A. D. 1866, negroes were eligible to vote: Vermont (Const. 1793, c. 1, art. 8, and chapter 2, § 39, and article 1 of its amendments); Massachusetts (Const. 1780, Amend. arts. 3, 20); New Hampshire (Const. 1792, Bill of Rights, art. 11); Maine (Const. 1819, art. 1, § 1); Rhode Island (Const. 1842, art. 2); New York (Const. 1846, art. 2); Mich. (Const. 1850, art. 7); New Jersey (Const. 1683, art. 3; Const. 1776, art. 4; Const. 1844 art. 2). In the following other states, free negroes were eligible to vote at different periods prior to January 1, 1866, to wit: Maryland

(Const. 1776, Bill of Rights, § 5): *Hughes v. Jackson,* 12 Md. 450.   Tenn. (Const. 1796, § 1, art. 3).   Texas (Const. 1836, § 11, art. 6; Const. 1845, § 2, art. 1).   South Carolina (Const. 178, art. 41).   Kentucky (Const. 1792, § 1, art. 3).   Delaware (Const. 1776, arts. 26, 27).   Alabama (Const. 1819, § 1, art. 1).   North Carolina (Const. 1776, art. 6).   Connecticut (Chart. 1662; Charter continued as Constitution until 1818).   Pennsylvania (Const. 1776, § 7, Decl. of Rights; Const. 1790, § 1, art. 3).

To say, because plaintiff or his ancestors, who were not entitled to vote under any organized form of government on or prior to January 1, 1866, or who were not then non-resident aliens having since come to the United States and become citizens by naturalization, that said amendment discriminates against them on account of race or color, is as unfounded as to say that a property qualification discriminates on account of previous condition of servitude for the reason that, if a man had not been held in bondage, he would have been able to acquire property, as a slave could not acquire property any more than he could vote.

It is a matter of common knowledge that the population of this state is cosmopolitan, embracing people of every creed and race from practically every state in the Union.   All of those persons who on January 1, 1866, or at any time prior thereto, were entitled to vote under any form of government or state or territory of this Union, or who at that time residing in some foreign nation, afterwards came to the United States and by naturalization became citizens of the United States, and their lineal descendants, regardless of race or previous condition of servitude, are permitted to vote at the elections in this state, without complying with the educational requirements of said provision.   That is a classification based upon a reason; that is, that any person who was entitled to vote under a form of government on or prior to said date is still presumed to be qualified to exercise such right, and the presumption follows as to his offspring; that is, that the virtue and intelligence of the ancestors will be imputed to his descendants, just as the iniquity of the fathers may be visited

upon the children unto the third and fourth generation. But as to those who were not enttiled to vote under any form of government on said date, or at any prior time, and their descendants, there is no presumption in favor of their qualification, and the burden is upon them to show themselves qualified. This does not apply to any one race, but to every race that falls within this disqualificaton. The alien who resided in some foreign country on the 1st day of January, 1866, who was not entitled to vote under that form of government, and who afterwards came to the United States, and became naturalized, was required to undergo an examination to show himself qualified and fitted for citizenship, and when the courts of this republic, or the different states thereof, exercising the powers of naturalization, have examined and passed upon his qualification, the presumption in favor of his qualification is recognized. The alien who resided in the United States on January 1, 1866, having not taken advantage of the opportunity to become a citizen of this republic, and who had not previously been a qualified voter, under some form of government, falls within the class upon whom the educational restriction is imposed. No alien or foreigner can become a qualified elector in this state until he has by naturalization become a citizen of the United States. The negro, previously a slave, who became a *freeman,* or had always been such, and resided in Massachusetts, Vermont, New Hampshire, Maine, Rhode Island, New York, Michigan, New Jersey and certain other states as named, at such times being permitted to vote, and otherwise being eligible to vote, living on January 1, 1866, or his descendants who reside in this state, may vote under this provision regardless of the educational requirement. As to the children of all electors, however, it is now compulsory upon them to attend the public schools of this state, and thereby receive an education. Article 1, c. 34, pp. 393, 395, Sess. Laws 1907-08.

But does this provision violate section 3 of the enabling act of Oklahoma of June 16, 1906 (chapter 3335, 34 Stat. p. 269),

which provides that the Constitution adopted in this state "shall make no distinction in civil or political rights on account of race or color"? · We think not. However, the people of this state, by section 1 of the Bill of Rights, have declared "that all political power is inherent in the people and government is instituted for their protection, security and benefit and to promote their general welfare and they have the right to alter or reform the same whenever the public good may require it, provided ·such change be not repugnant to the Constitution of the United States."

The state was erected and admitted into the Union under this Constitution, which was passed on by the President of the United States, and his proclamation of admission issued thereon with such a declared reservation on the part of sovereignty. It is specifically provided in said section that the right to alter or reform the same whenever the public good may require it is limited by· the proviso only to the extent that such alteration or revision shall not conflict with the Constitution of the United States. It has time and again been held that, if the Constitution of a state contains any modifications of the provisions of the enabling act whereby the state has been formerly admitted by the President and Congress into the Union, the modification contained in the Constitution controls. *Romine v. State et al.,* 7 Wash. 215, 34 Pac. 924; *Edwards v. Lesueur,* 132 Mo. 410, 33 S. W. 1130, 31 L. R. A. 815; *Williams v. Hert* (C. C.) 110 Fed. 166; *State of Montana v. Rice,* 204 U. S. 291, 27 Sup. Ct: 281, 51 L. Ed. 490. It is therefore not essential in this case to determine whether a provision in the enabling act accepted by an irrevocable ordinance on the part of the state, preliminary to admission, could have a continuing, binding force upon the state after its erection and admission into the Union upon an equality with the other states so as to control the government in its sovereign capacity in the exercise of a purely governmental power.

A part of section 3 of the enabling act provides that the convention "shall declare on behalf of the people of said proposed state that they adopt the Constitution of the United States; where-

upon the said convention shall, and is hereby authorized to form a Constitution and state government for said proposed state. The Constitution shall be republican in form and make no distinction in civil or political rights on account of race or color, and shall not be repugnant to the Constitution of the United States and Declaration of Independence." Section 4 of the enabling act provides:

"* * * * And if the Constitution and government of said proposed state are republican in form, and if the provisions in this act have been complied with in the formation thereof, it shall be the duty of the President of the United States, within twenty days from the receipt of the certificate of the result of said election and the statement of votes cast thereon and a copy of said Constitution, articles, propositions and ordinances, to issue his proclamation announcing the result of said election; and thereupon the proposed state of Oklahoma shall be deemed admitted by Congress into the Union, under and by virtue of this act, on an equal footing with the original states."

The provision of section 3 was directed to the Constitutional Convention as to the character of Constitution to frame, which having been so framed and adopted, the President was to issue his proclamation thereon. It was not attempted to continue that part of the enabling act in force forever as an irrevocable limitation on the sovereign powers of the state in that respect.

In *Williams v. Miss., supra,* it was said:

"It cannot be said, therefore, that the denial of the equal protection of the laws arises primarily from the Constitution and laws of Mississippi, nor is there any sufficient allegation of an evil and discriminating administration of them. The only allegation is 'by granting a discretion to the said officers, as mentioned in the several sections of the Constitution of the state, and the statute of the state adopted under the said Constitution, the use of which discretion can be and has been used by said officers in the said Washington county to the end here complained of, towit, the abridgment of the elective franchise of the colored voters of Washington county, that such citizens are denied the right to be selected as jurors to serve in the circuit court of the county, and that this denial to them of the right to equal protection and benefits of the laws of the state of Mississippi on account of their

color and race, resulting from the exercise of the discretion partial to the white citizens, is in accordance with and the purpose and intent of the framers of the present Constitution of said state.'

"It will be observed that there is nothing direct and definite in this allegation either as to means or time as affecting the proceedings against the accused. There is no charge against the officers to whom is submitted the selection of grand or petit jurors, or those who procure the list of the jurors. There is an allegation of the purpose of the convention to disfranchise citizens of the colored race; but with this we have no concern, unless the purpose is executed by the Constitution or laws or by those who administer them. If it is done in the latter way, how or by what means should be shown. We gather from the statements of the motion that certain officers are invested with discretion in making up lists of electors, and that this discretion can be and has been exercised against the colored race, and from these lists jurors are selected. The Supreme Court of Mississippi, however, decided, in a case presenting the same questions as the one at bar, 'that jurors are not selected from or with reference to any lists furnished by such election officers.' *Dixon v. State*, 74 Miss. 278 [20 South. 841] November 9, 1896.

"We do not think that this case is brought within the ruling in *Yick Wo v. Hopkins, Sheriff*, 118 U. S. 356 [6 Sup. Ct. 1064] 30 L. Ed. 220. In that case the ordinances passed on discriminated against laundries conducted in wooden buildings. For the conduct of these the consent of the board of supervisors was required, and not for the conduct of laundries in brick or stone buildings. It was admitted that there were about 320 laundries in the city and county of San Francisco, of which 240 were owned and conducted by subjects of China, and of the whole number 310 were constructed of wood, the same material that constitutes nine-tenths of the houses of the city, and that the capital invested was not less than $200,000.

"It was alleged that 150 Chinamen were arrested, and not one of the persons who were conducting the other 80 laundries and who were not Chinamen. It was also admitted 'that petitioner and 200 of his countrymen similarly situated petitioned the board of supervisors for permission to continue their business in the various houses which they had been occupying and using for laundries for more than twenty years, and such petitions were denied, and all the petitions of those who were not Chinese, with

one exception, that of Mrs. Mary Meagles, were granted.' The ordinances were attacked as being void on their face, and as being within the prohibition of the fourteenth amendment; but, even if not so, that they were void by reason of their administration. Both contentions were sustained. Mr. Justice Matthews said that the ordinance drawn in question 'does not prescribe a rule and conditions for the regulation of the use of property for laundry purposes, to which all similarly situated may conform. It allows without restriction the use for such purposes of buildings of brick or stone; but, as to wooden buildings, constituting nearly all those in previous use, it divides the owners or occupiers into two classes, not having respect to their personal character and qualifications for the business, nor the situation and nature and adaption of the buildings themselves, but merely by an arbitrary line, on one side of which are those who are permitted to pursue their industry by the mere will and consent of the supervisors, and, on the other, those from whom that consent is withheld, at their mere will and pleasure.' The ordinances, therefore, were on their face repugnant to the fourteenth amendment. The court, however, went further and said: 'This conclusion, and the reasoning on which it is based, are deductions from the face of the ordinance, as to its necessary tendency and ultimate actual operation. In the present cases we are not obliged to reason from the probable to the actual, and pass upon the validity of the ordinances complained of, as tried merely by the opportunities which their terms afford, of unequal and unjust discrimination in their administration; for the cases present the ordinances in actual operation, and the facts shown establish an administration directed as exclusively against a particular class of persons as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secure to the petitioners, as to all other persons, by the broad and benign provisions *of the* fourteenth amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar cir-

cumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution. This principle of interpretation has been sanctioned in *Henderson v. Mayor of New York (Henderson v. Wickham)* 92 U. S. 259, 23 L. Ed. 543; *Chy Lung v. Freeman,* 92 U. S. 275, 23 L. Ed. 550; *Ex parte Virginia,* 100 U. S. 339, 25 L. Ed. 676; *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567; and *Soon Hing v. Crowley,* 113 U. S. 703 [5 Sup. Ct. 730] 28 L. Ed. 1145.'

"This comment is not applicable to the Constitution of Mississippi and its statutes. They do not on their face discriminate between the races, and it has not been shown that their actual administration was evil, only that evil was possible under them."

As was said by the Supreme Court of the United States in *Pope v. Williams, supra,* the reasons which may have impelled the people to adopt this amendment were matters entirely for their consideration, and this court has no concern with them.

This amendment has never been put in operation since its adoption, and how could it be "shown that their (its) actual administration was evil until the same is put in operation?" *Williams v. Miss., supra.* Every election officer is sworn not only to observe but also to obey the law, which includes this amendment. And the presumption is that they will fairly carry the law into effect. Should the election officers knowingly and wilfully exclude negroes from voting who are qualified to vote under section 4a, art. 3, sufficiently in number, had all been counted for the next highest candidate, to have changed the result of the election, said election would be void. *Martin v. McGarr, infra.*

The parties hereto in the argument have treated the questions as properly raised under this proceeding. Without passing on whether the proper remedy had been invoked, for the purpose of this case, we have assumed that such relief may be obtained by injunction.

The judgment of the lower court is affirmed. .

DUNN, C. J.; and HAYES and TURNER, JJ., concur; KANE, J., concurs in the conclusion reached, but dissents from that part of the reasoning as to the enabling act.