**Sheila G. SIMPSON, Petitioner,**

**v.**

**The Honorable Bryan C. DIXON, Presiding Judge over the Petition for Irregularities in the March 16, 1993 Primary Election for Ward Three Councilman for the City of Oklahoma City; Marti Hayes, Oklahoma County Election Board Secretary; Jack W. Cornett, Contestant of the March 16, 1993 Primary Election for Ward Three, Councilman for the City of Oklahoma City, Respondents.**

**No. 81318.**

Supreme Court of Oklahoma.

May 21, 1993.

Brian M. Dell, Oklahoma City, for petitioner.

Robert L. Mitchell, Oklahoma City, for respondent Marti Hayes.

Thomas L. Spencer, Thomas E. Prince, York & Slater, Oklahoma City, for respondent Jack W. Cornett.

OPALA, Justice.

In this original proceeding two issues are tendered for our consideration: (1) Is Art. 10, § 7 of the Oklahoma City Charter contrary to the statutory procedure for filing an election protest? and (2) Is protest time for municipal elections controlled by the

state law that governs the issuance of a certificate of election? We take original cognizance of the case, answer the first question in the negative and the second in the affirmative, and deny the writs, leaving undisturbed the trial judge's order.

# I

## THE ANATOMY OF LITIGATION

Petitioner Sheila Simpson was initially determined the successful candidate at the primary election held Tuesday, March 16, 1993 for the office of City Council, Ward 3, in Oklahoma City. According to the announced results, Simpson received 2,005 votes and her only opponent, respondent Jack W. Cornett, received 1,994. On Friday following the election Cornett at 2:00 p.m. filed a protest challenging irregulari-

ties in the conduct of the election.[2] Simpson moved to dismiss Cornett's petition as untimely. She argued that Art. 10, § 7[3] of the City Charter prescribes a two-day deadline for challenging the election results and that Cornett's petition, which was filed on the third day in conformity to state law, 26 O.S.1991 § 8–109,[4] came too late.

At the hearing on the petition Cornett presented proof of irregularities. Simpson stood on her objection to the district court's "jurisdiction"; *she offered no evidence. The trial court found that the election irregularities made it mathematically impossible to determine a winner and directed the county election board to notify the governor in compliance with the provisions of § 8–122.[5]* The trial judge

---

**2.** Cornett alleged below that 104 persons *registered to vote in Ward 6* of Oklahoma City were improperly permitted to vote in the Ward 3 primary, and that the winner of the election could not be determined with mathematical certainty. *He sought a new election for Ward 3.*

**3.** Simpson relies on the *second paragraph* of Art. 10, § 7 of the Oklahoma City Charter, *infra* note 7, which states:

" * * * Said Certificate of Election Returns to be issued, unless stayed by a timely filed application and notice of contest or challenge to correctness of the announced results, within two (2) days next following said primary and general elections. * * * "

**4.** The terms of 26 O.S.1991 § 8–109 provide: *"Any candidate* whose name appeared on a Primary, Runoff Primary or General Election ballot, or any individual authorized to request a recount pursuant to Section 8–111 of this title *may, at any time before 5:00 p.m. Friday next following an election, contest the correctness of the announced results* of said election by filing a written petition with the appropriate election board. Contests alleging irregularities or fraud shall not be permitted in any election except those in which candidates are seeking office. Nothing in this section shall be construed to prohibit any proceedings in district court, which are otherwise authorized by law, alleging irregularities or fraud in an election." (Emphasis added.)

The corresponding State Election Board Rules [Oklahoma Administrative Code, Title 230, Chapter 45, Subchapter 3, §§ 1 and 2, hereinafter cited as 230:45–7–1 and 230:45–7–2] provide in pertinent part:

"**230:45–7–1. Allegations of fraud**
(a) **Petition to be filed.** Any candidate may, by 5 p.m. Friday following an election, file a

written petition alleging fraud with the Secretary of the County Election Board. Said petition must be accompanied by a bond in the amount of $5,000. {26:8–119} Petitions alleging fraud shall not be accepted in question elections. {26:8–109} * * *"
"**230:45–7–2. Allegations of irregularities**
(a) **Petition to be filed.** Any candidate may, by 5 p.m. Friday following an election, file a petition alleging irregularities in that election with the Secretary of the County Election Board. * * * "

The State Election Board Rules set out in this opinion were codified eff. December 30, 1991. These rules are promulgated pursuant to 26 O.S.1991 § 2–107, *infra* note 36.

**5.** The terms of 26 O.S.1991 § 8–122 are:

"In the event, after a hearing is conducted, it is deemed impossible to determine ... to whom a certificate of election shall be issued, ... the *judge shall notify the appropriate election board secretary* of the same. It shall then be the *duty of the election board secretary to notify the Governor* of said decision. The *Governor shall then order a new election* to be conducted as soon as is practicable in the same manner as the contested election, with the identical candidates, provided that any candidate upon whom fraud has been proved shall not be a candidate in the new election. Provided further, the above shall not apply to elections resulting in tie votes, which elections shall be determined as provided by law." (Emphasis added.)

The terms of the corresponding State Election Board Rule, 230:45–7–13, are:

"**230:45–7–13. New election possible**
(a) **Judge must notify Secretary.** In the event the presiding District Judge determines that it is impossible to determine the winner

overruled Simpson's dismissal quest, concluding that (1) the City Charter is silent on the conduct of election protests and does not prescribe a deadline for a candidate's challenge, (2) Art. 10, § 5[6] of the City Charter makes the general laws of the State applicable to municipal election contests except as otherwise provided in the Charter, (3) election contests are conducted by a state district judge and are "run through" the county election board, (4) the state has a paramount interest in conducting uniform election contests throughout the state and (5) contests "must be uniform so that the public will have confidence in knowing that their elections are conducted properly...." *This court stayed the trial judge's order pending disposition of this original proceeding.*

Simpson seeks this court's command (a) prohibiting the county election board from notifying the governor and (b) directing

of an election, or the names that should appear on a Runoff Primary Election ballot, he shall notify the Secretary of the County Election Board. {26:8–122}
**(b) Secretary to notify Governor.** When the Secretary receives a notice from the presiding District Judge, as set forth in (a), he shall notify the Governor of the ruling in order that the Governor can call a new election. {26:8–122}"

6. The provisions of Art. 10, § 5 of the Oklahoma City Charter are:
"**Section 5. General Election Laws Applicable.** Except as in this Article X provided, in said primary election for the nomination of the Mayor and the Councilmen and in the general election and canvass of returns and all other proceedings whatever relating to said elections, either primary or general, the general laws of this State applicable to municipal elections and primaries are hereby adopted and put into full force and effect with the further exception and proviso that on the primary and general election ballots no party emblem or party designation shall appear and the names of all nominees who are required to be on the ballot shall appear in one column."

7. The terms of Art. 10, § 7 of the Oklahoma City Charter are:
"**Section 7. Procedure to Certify the Returns and the Issuance of Certificates of Election.** Each County Election Board herein charged with the duty of conducting the elections in The City of Oklahoma City *shall fur-*

that a certificate of election be issued to her by the county election board. Our pronouncement leaves the trial judge's ruling undisturbed.

## II

## SECTION 7 OF THE CITY CHARTER CANNOT BE CONSTRUED AS CONTRARY TO THE 3-DAY PROTEST PERIOD PRESCRIBED BY STATE LAW

Facially, Art. 10, § 7 of the City Charter[7] is not intended to limit the time for bringing an election protest. *Its main function is to coordinate the actions of the election boards in the several counties where Oklahoma City is located*[8] *with respect to the issuance of a single certificate of election to the successful candidate.* Section 7 is trifurcated into separate

*nish the County Election Board of any other county in which a part of any particular ward is situated a copy of the Certificate of Election Returns for both the primary and general elections.*
Said Certificate of Election Returns to be issued, *unless stayed by a timely filed application and notice of contest or challenge to correctness of the announced results,* within two (2) days next following said primary and general elections.
Certificate of Nomination shall be executed and issued jointly by each County Election Board involved designating two candidates receiving the highest number of votes at the primary election as nominees, whose names shall appear on the ballot at the general election. *Said Certificate of Nomination to be issued, unless stayed by a timely filed application and notice of contest or challenge to the correctness of the announced results,* within two (2) days next following said primary election.
A Certificate of Election shall be issued jointly by each of the County Election Boards herein charged with the duty of conducting the elections to the nominee receiving the highest number of votes at the general election in each ward. *Said Certificate of Election to be issued within four (4) days next following the issuance of the Certificate of Election Returns of said general election."* (Emphasis supplied.)

8. Oklahoma City ward boundaries are established by Ordinance No. 19,715, enacted March 6, 1992.

post-election stages: (1) certificate *of election returns,* (2) certificate *of nominations* and (3) certificate *of elections.* None of its provisions conflicts with the State's three-day statutory time limit for election protests.[9]

**9.** For the text of the statutory time limit for filing an election protest, see 26 O.S.1991 § 8–109, *supra* note 4.

**10.** Art. 10, § 7 of the Oklahoma City Charter, *supra* note 7. Section 7 was enacted in 1971. Its reference to issuing copies of the certificate of election returns·to the other county election boards bears striking similarity to the process prescribed in 11 O.S.1971 § 1291 (now re-pealed), which provid*ed:*

"The county election board of each county of which said city is situated in, shall have juris-diction of the city elections and each election board shall *certify the returns to the other before issuing certificates of said elections.* Said certificates to be based on the combined votes of both counties." (Emphasis added). In 1971 § 1291 *only* applied to cities with a population *under* 20,000. Oklahoma City ap-pears to have enacted a similar provision for itself in Art. 10, § 7, *supra* note 7 (first para-graph). The purpose of 11 O.S.1971 § 1291, like that of § 7 of the City Charter, *is to ensure that all of the county election boards participating in a city election can confirm the vote tallies before a joint certificate of election is issued.*

The exchange of information to be accom-plished in this manner—namely by giving copies of the certificate of election returns to other counties that participate in the election—*appears to be no longer necessary.* A *new* enact-ment in the 1974 election laws, 26 O.S.Supp. 1974 § 13–110, and its successor, 26 O.S.1991 § 13–110, directs that county election board where the municipality's central offices are lo-cated conduct the election. The terms of 26 O.S.1991 § 13–110 are:

"Elections for a municipality which is located in more than one county shall be conducted by the county election board of the county wherein said municipality's central offices are located. The county election board or boards of the other affected county or counties shall provide such assistance as may be necessary for conduct of an election."

The pertinent terms of the corresponding State Election Board Rules, 230:40–5–65, 230:40–5–44 and 230:35–3–91, are:

"**230:40–5–65. Municipalities in more than one county**
(a) **Supervision.** For a municipality that is located in more than one county, the election shall be conducted by the County Election Board wherein the municipality's central of-fices are located. {26:13–110} This County Election Board hereafter is called the "parent County Election Board." The Election Boards

## A.

### The Certificate of Election Returns

■ The first paragraph of § 7 provides that *every county election board* charged with conducting the election *is to give any other county election board* that partici-pates in the· election a copy of the certifi-cate *of election returns.*[10] These certifi-

of the other counties in which part of the municipality is located hereafter are called the "affected County Election Boards." * * *
(e) **Mailing returns.** The Secretaries of the affected County Election Boards shall mail a copy of the returns of the election in their counties to the parent County Election Board on the night of the election. Results may be communicated orally, but certification shall not be made except by using written returns. The parent County Election Board shall tabu-late the returns from the parent and affected counties and certify the results. See 230:40–5–44. * * *"

"**230:40–5–44. Certification**
The County Election Board shall certify re-sults of any municipal election to the govern-ing board of the municipality for which the election was held. Certificates of Election shall be issued to the successful candidates by the County Election Board in the same man-ner as is prescribed for County Officers. {26:13–106}"

"**230:35–3–91 [amended July 1, 1992]. Certi-fying county results**
(a) **Election night.** On election night, the County Election Board may certify ... the results of elections for which the county is an affected county....;
(b) **Friday at 5 p.m.** The County Election Board shall meet at 5 p.m. Friday following each election involving ... a multi-county election for which the county is the parent county, *provided that no contests of election have been filed as outlined in Chapter 45, Subchapter 3, of this Title.* The County Elec-tion Board must have in its possession written results from each affected county before re-sults of a multi-county election for which the county is the parent county shall be certi-fied....
(c) **Disposition of Certification Reports.** One copy of each signed, official Certification Report shall be maintained permanently by the County Election Board. Other copies shall be distributed as follows. * * *
    (2) *In multi-county elections for which the county is an affected county, one signed copy of the Certification Report shall be mailed to the parent county on the day following the election.* * * *" (Emphasis added.)

This procedure allows the *parent* county elec-tion board to conduct the election while the *affected* county election boards participating in the election simply supply the *parent* with the certificates of election results (returns). Since only one county election board *controls* the elec-

cates *are to be issued to the other respective county election boards* within two days of the day the primary election is held.[11]

Nothing in the language dealing with the issuance of the certificate *of election returns* abridges the statutory period for filing an election protest. The terms of the *second paragraph* of § 7 are:

"Said Certificate of Election Returns to be issued, *unless stayed by a timely filed application and notice of contest or challenge to correctness of the announced results*, within two (2) days next following said primary and general elections." (Emphasis added.)

The third clause, which pertains to the two-day limit for issuance of the certificate *of election returns*, modifies the verb "issued" found in the first clause. *The second clause, which is set off by commas, contains the only reference to election protests.* The phrase "timely filed" has reference to *other law* that regulates the time for filing a protest. Whether a *certificate of election returns* is issued *before or after*[12] an election protest *is utterly irrelevant to and has no bearing upon the time an election protest must be filed. We hence conclude that paragraphs 1 and 2 of § 7 do not prescribe a limit contrary to the State's three-day protest period.*

## B.
### *The Certificate of Nomination*

The purpose of certificate *of nomination*, described in the third paragraph of § 7, is to designate the two candidates who have garnered the most votes in a primary election and will compete in a general election. The primary election *in this case* was, for all intents and purposes, a general election. Simpson and Cornett were the *only* candidates.

Although no issue concerning the certificate *of nomination* is before this court, it is significant to note that this paragraph also contains the same "unless stayed" clause. This paragraph provides in part:

" * * * *Said Certificate of Nomination to be issued, unless stayed by a timely filed application and notice of contest or challenge to the correctness of the announced results*, within two (2) days next following said primary election." (Emphasis added.)

If the drafters intended the clause to be a limitation on the time an election protest is to be filed, it would not have been necessary to mention this twice in § 7, for one of

---

tion, it would appear no longer necessary for the *parent* to give a copy of the Certificate of Election Returns (results) to an affected county election board. This is so because the parent now has power ultimately to certify the results unilaterally. *See* State Election Board Rules, 230:40–5–65(e) and 230:35–3–91(a), supra; 26 O.S.1991 § 13–106, *infra* note 14.

**11.** The first paragraph of Art. 10, § 7, *supra* note 7, as enacted in 1971, seems to refer to 26 O.S.1971 § 234 (now repealed), which provided in part that "... when the result [in municipal] contests have all been recorded from the counter's certificates, *said Board ... shall certify the result ....*" The quoted portion of 26 O.S.1971 § 234, *supra*, appears to have been incorporated into 26 O.S.Supp.1992 § 8–115, which provides in part:

"When all ballots have been counted, the county election board shall tabulate the votes and *shall certify the results....*"

For the corresponding State Election Board Rule, see 230:35–3–91(a) and (c)(2), *supra* note 10, and 230:40–5–65(a) and (e), *supra* note 10, which outline the procedure for certifying election returns (results).

**12.** While it may be argued that the "unless stayed" clause of the second paragraph in Art. 10, § 7, *supra* note 7, would be rendered useless if a protest were allowed to be filed after the issuance of a certificate *of election returns*, that contention is at most illusory. When a clause starts with the word "unless," *it is used as a contingency. Kansas City Structural Steel Company v. L.G. Barcus & Sons, Inc.*, 217 Kan. 88, 535 P.2d 419, 423 (1975); *Graham v. Wichita Terminal Elevator Co.*, 115 Kan. 143, 222 P. 89, 90 (1924); Black's Law Dictionary, p. 1536 (6th Ed.1990). If the event does not occur (i.e., the filing of a timely application and notice of contest) the clause is not triggered.

Even if we assumed *arguendo* that the clause does pertain to the time *for filing an election protest*, the "unless stayed" clause could easily be viewed as superfluous. If, for example, the county election boards conducting the election issued a copy of the certificate *of election returns* on the *first* day instead of the second (for the language only contemplates that the certificate of election returns be issued *"within"* two days), an application and notice of contest could be timely filed on the second day *after* the issuance of the certificate *of election returns.*

the two clauses is clearly surplusage. The more correct and better interpretation of the two "unless stayed" clauses is hence that they refer to law other than the Charter for the time an election protest is to be filed.[13] *Because paragraph three does not address when an election protest is to be filed for a primary election, it cannot be construed as abridging the statutory protest period.*

## C.

### The Certificate of Election

■ The certificate *of election* is the official vote tally. This is the *critical document.* The § 7 procedure for the issuance of that instrument does not conflict with the state procedure. According to the fourth paragraph in § 7, the certificate of election is to be issued jointly by all participating county election boards four days

after the certificate of election returns is issued.[14] It is clear from Art 10, § 1(b) of the Charter [15] that the issuance of a certificate *of election* is not necessarily contingent upon the issuance of the certificate *of election returns.* Section 1(b) simply states that a certificate *of election* may be issued within six days after the election. *These Charter provisions are consistent with the state election procedure, which requires the county election board to wait until the time period for filing contests has expired, i.e. at 5:00 p.m. on the Friday after the election.*[16]

■ A conflict exists between a state enactment and a municipal charter or ordinance when both contain either express or implied provisions that are inconsistent or irreconcilable with one another. There is no conflict if one is silent on the issue and the other speaks to it.[17] *No provision in § 7 that deals with (1) certificate of elec-*

**13.** This paragraph appears to track the language of 26 O.S.1971 § 391 (now repealed), which provid*ed* that any candidate for party nomination to county office may, at any time *before noon Thursday* next following the primary election, "file a protest with the county election board." That section did not allow the issuance of a certificate of party nomination *until after noon on that Thursday.* The 1974 State Election Code changed the protest time for primary, runoff primary or general election to "any time before 5:00 p.m. Friday next following an election". 26 O.S.Supp.1974 § 8–109. The law remains unchanged, *see* 26 O.S.1991 § 8–109, *supra* note 4. The two-day time limit provisions that remain in the City Charter were doubtless intended to track the pre–1974 state law. They are now out of date.

**14.** The terms of 26 O.S.1991 § 13–106 are:
"At the time prescribed by law, the county election board shall certify the results of any municipal election to the governing board of the municipality for which said election was held. Certificates of election shall be issued to the successful candidates by the county election board, in the same manner as is prescribed for county officers."
Although the *parent* county election board ultimately issues the certificate of election, it is done so in conjunction with the *affected* county election boards, see *supra* note 10. The fact that § 13–106 does not require the parent and affected county election boards to issue a joint certificate of election presents no *real* conflict with the City Charter.
Section 13–106 refers to 26 O.S.1991 § 8–106, which provides:

"No such lists or certificates shall be issued either by the county election board or State Election Board before 5:00 p.m. Friday next following a Primary, Runoff Primary or General Election."
We note that this provision does not conflict with the interpretation that is given to the second paragraph of § 7. *See* Part II(A), *supra.* The second paragraph refers to *issuing a copy of the Certificate of Election Returns.* The terms of 26 O.S.1991 § 8–106 only refer to (a) how the state and county election boards "certify successful candidates," (b) "certificates of election" (26 O.S.1991 § 8–103) and (c) "certificates of nomination" (26 O.S.1991 § 8–101). For the corresponding State Election Board Rules, see 230:40–5–44, *supra* note 10. The terms of 230:40–5–65(e), *supra* note 10, require the affected county election boards to mail a copy of the election results to the parent county election board on the night of the election.

**15.** The pertinent terms of Art. 10, § 1(b) of the Oklahoma City Charter are:
"... [I]t shall be the duty of the County Election Boards of each of the respective counties within which the corporate limits of The City of Oklahoma City are situated, to issue jointly to such candidate, within *six days after the date of said General City Election,* a certificate of election in due and proper form as now provided by law." (Emphasis added).

**16.** *See* 26 O.S.1991 § 8–106, *supra* note 14.

**17.** *State ex rel. Trimble v. City of Moore,* Okl., 818 P.2d 889, 898 (1991); *Vinson v. Medley,* Okl., 737 P.2d 932, 936 (1987); *Moore v. City of Tulsa,* Okl., 561 P.2d 961, 963 (1977).

tion returns, (2) certificate *of nomination* or (3) certificate *of election* can be read as in conflict with the state election law regulating the time for filing an election protest. Since *none* of the paragraphs in § 7 speaks to the time *for filing an election protest,* there is no conflict with state law.

■ When a statute or city law is susceptible to more than one construction, it must be given that interpretation which frees it from constitutional doubt rather than one that would make it fraught with fundamental-law infirmities.[18] Placing on § 7 the meaning that Simpson presses upon us—namely that paragraph two of § 7 contains a two-day time limit for an election protest—would make that section vulnerable to a constitutional challenge. We must and will give the City Charter a construction that is consistent with our fundamental law's uniformity mandate for a "free and equal" election.[19]

In sum, if § 7 was meant to vary from rather than to track the pertinent state statutes (26 O.S.1991 § 8–106, *supra* note 14, § 8–109, *supra* note 4, § 13–106, *supra* note 16), the intent to enact a non-conforming city regulation is not textually demonstrable. We hold that the respondent trial judge correctly interpreted § 7 as *not in conflict* with the statutory three-day time limit for filing an election protest.

## III

### CORNETT'S PROTEST IS GOVERNED BY THE PROVISIONS OF 26 O.S. 1991 § 8–109,[20] WHICH IS PART OF THE STATUTORY REGIME THAT REGULATES PROCEDURE FOR THE ISSUANCE OF THE CERTIFICATE OF ELECTION

#### A.

*The Provisions Of Art. 3, § 5,[21] and Art. 5, § 46,[22] Okl. Const., Explicitly Command Statewide Uniformity of Laws That Govern The Conduct Of Elections For A Corruption–Free Ballot Process*

■ *The actual process of balloting—* from its beginning through the protest and issuance of election certificate—*is an exclusive state function.* Our fundamental law *guarantees* to all electors the right to a "free and equal" election (Art. 3, § 5)[23] and *explicitly* commands *uniformity of procedure* to keep the election-return process free of corruption (Art. 5, § 46).[24] Section 46 prohibits the passage of any *special or local laws* regulating the *conduct of elections.*[25] The § 46 mandate con-

18. *State v. Okl. State Bd. For Property,* Okl., 731 P.2d 394, 398–399 (1987); *Ricks Exploration Company v. Okl. Water Resources Bd.,* Okl. 695 P.2d 498, 504 (1985); *Neumann v. Tax Com'n.,* Okl., 596 P.2d 530, 532 (1979); *Wilson v. Foster,* Okl., 595 P.2d 1329, 1333 (1979).

19. For an explanation of that mandate in our fundamental and statutory law, see Part III *infra.*

20. For the text of 26 O.S.1991 § 8–109, see *supra* note 4.

21. The pertinent terms of Art. 3, § 5, Okl. Const., are:
   "All elections shall be *free and equal.* No power, civil or military, shall ever interfere to prevent the *free exercise* of the right of suffrage...." (Emphasis added.)
   *See* also the terms of Art. 2, § 4, Okl. Const.:
   "No power, civil or military, shall ever interfere to prevent *the free exercise of the right of suffrage* by those entitled to such right." (Emphasis added.)

22. The pertinent terms of Art. 5, § 46, Okl. Const., are:

"The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:

  * * * * * * *

For the opening and conducting of elections, or fixing or changing the places of voting; * * *"

23. For the pertinent terms of Art. 3, § 5, Okl. Const., see *supra* note 21.

24. For the pertinent terms of Art. 5, § 46, Okl. Const., see *supra* note 22.

25. In *Johnson v. State Election Board,* 197 Okl. 211, 167 P.2d 891, 893 (1946), we had under scrutiny a legislative enactment that *only* applied to the procedure for nominating Tulsa County judges. There we held the statute in contest to be violative of the § 46 uniformity mandate because it set the Tulsa County nominating district apart from others and applied to it "a system or plan different from the general law in the matter of *conducting the elections."* (Emphasis added.)

templates a general law prescribing election conduct procedures that are uniform throughout the State.[26] Section 5's guarantee of a *"free and equal"* election means that every qualified voter has the right to cast a vote and *to have that vote fairly counted.*[27] This can only be achieved through uniform, state-regulated procedures for the conduct of elections.[28]

While a city creates the municipal offices and can effect the manner in which officers are to be selected,[29] the State takes charge of the balloting process to prevent any deviation from the procedure of certifying the election result. State control is implied in the Art 5, § 46 uniformity-of-procedure mandate and inferred from the Art. 3, § 5 guarantee of a corruption-free canvass. The statute regulating protests vitalizes and implements these constitutional provisions.[30]

If the City Charter were to be construed as prescribing different limits or deadlines for a protest, *it would offend* the § 46 prohibition against *local* or *special* laws upon the *conduct* of an election.[31] *City of Tulsa v. Macura*[32] teaches that a charter provision which contravenes § 46—because it addresses itself to a subject upon which legislative uniformity is explicitly mandated—*is facially void.* As we noted in *Sherwood Forest No. 2 Corp. v. City of Norman*,[33] a city ordinance can neither shorten nor enlarge a legislatively prescribed limitations period. If it were not so, the city's exercise of authority would contravene the provisions of § 46. Similarly, in *Walker v. City of Moore*[34] we said that the notice

**26.** For other applications of § 46's uniformity mandate, see *Tate v. Browning-Ferris, Inc.*, Okl., 833 P.2d 1218, 1229 (1992); *Massey v. Farmers Ins. Group*, Okl., 837 P.2d 880, 890 (1992) (Opala, C.J., concurring in result); *Henry v. Corporation Commission*, Okl, 825 P.2d 1262, 1271 (1990) (Opala, V.C.J., concurring); *Board of County Com'rs v. Muskogee*, Okl., 820 P.2d 797, 806 (1991); *Sisson by and through Allen v. Elkins*, Okl., 801 P.2d 722, 728 (1990) (Opala, V.C.J., concurring in judgment); *Reynolds v. Porter*, Okl., 760 P.2d 816, 822 (1988); *Prudential Property & Cas. Co. v. Grimes*, Okl., 725 P.2d 1246, 1251 (1986) (Opala, J., concurring); *Maule v. Independent School Dist. No. 9*, Okl., 714 P.2d 198, 203 n. 30 (1986).

**27.** For the pertinent terms of Art. 3, § 5, Okl. Const., see *supra* note 21. For an historical explanation of our constitutional guarantee in § 5, see *Jackson v. Maley*, Okl., 806 P.2d 610, 623-624 (1991) (Opala, C.J., dissenting).

**28.** If the laws governing the conduct of elections are not kept uniform, a significant problem would face those county election boards which conduct concurrent elections for several municipalities. If ten municipalities within one county were to hold elections the same day, the county election board could very well have to follow *ten different* procedures for conducting protests. The complexities and disparities would in that context invite lax practices.

**29.** *See infra* Part III(B).

**30.** Even though Nebraska's fundamental-law command is not as explicit as that in Art. 5, § 46, *supra* note 22, and Art. 3, § 5, Okl. Const., *supra* note 21, its highest appellate court held that *a municipal election contest is a state function, and a statute governing the time for filing an election contest takes precedence over contrary provisions in a city code. McMaster v. Wilkinson*, 145 Neb. 39, 15 N.W.2d 348, 351 (1944). In *McMaster*, a factually similarly case, the court reasoned that " '[w]here the legislature has enacted a law affecting municipal affairs, but which is of statewide concern, such law takes precedence over any action taken by a home rule city under its charter.' " *See also* Sands, Libonati & Martinez, Local Government Law § 3.17, p. 3–61 (1981).

**31.** *City of Tulsa v. Macura*, 186 Okl. 674, 100 P.2d 269 (syllabus 3) (1940); *Walker v. City of Moore*, Okl., 836 P.2d 1289, 1293 n. 9 (1992); *Sherwood Forest No. 2 Corp. v. City of Norman*, Okl., 632 P.2d 368, 370 (1980). *See* in this connection *Roberts v. South Oklahoma City Hosp. Trust*, Okl., 742 P.2d 1077, 1084–1085 (1987) (Opala, J., concurring).

**32.** *Macura, supra* note 31 (citing *City of Tulsa v. McIntosh*, 141 Okl. 220, 284 P. 875, 876–877 (1930); *City of Tulsa v. Adams*, 151 Okl. 165, 3 P.2d 155 (1931)). In *Macura* the offending charter provision required written notice to city officials within 30 days of one's injury as an indispensable legal prerequisite for an action against the city to recover damages for bodily harm.

**33.** *Supra* note 31. In *Sherwood Forest*, the city sued the principal upon a subdivision improvement bond. The court held that the statutory five-year limitations period for contract actions, rather than the *two-year period prescribed in the city's sidewalk ordinance*, was applicable to the city's action to recover on the bond.

**34.** *Supra note* 31. In *Walker* the city asserted that the Governmental Tort Claims Act requires a separate notice of the derivative loss-of-consortium claim of a spouse. The court held the

requirements in the Governmental Tort Claims Act may not be enlarged by local law.

## B.

### *The Nondelegable State Function of Conducting Elections Is Distinct From The Purely Municipal Function of Regulating The Manner In Which Elected Officials Are Selected For Office*

■ Our concern here is with the *core state function of election conduct*—i.e., the actual process of balloting. This function begins with (a) the opening of the polls to receive qualified electors, (b) the casting of ballots, (c) the tallying of the vote, (d) the preservation and validation of the ballots, (e) the certification of the election results and (f) the issuance of a certificate of election. From its beginning to the end that task constitutes an exclusive nondelegable state function to be conducted by county election boards [35] under the supervisory authority of the Secretary of the State Election Board.[36] *The State Board, which is in command of all municipal elections, employs the same machinery to conduct city elections as it does for elections of state and county officials or questions.*

An *election challenge* is part and parcel of that election-return process. It addresses itself to irregularities, departures and deficiencies in the prescribed procedures for casting ballots. *The actual conduct of the election is solely in the hands of the State, from the very time a ballot is cast until the point when, for a lawful reason, it is either validated or invalidated.*

A city charter, on the other hand, creates the elective offices and regulates the manner in which elected officials are to be selected. These *pre-balloting* functions include, *inter alia,* determining (a) what officials are to be elected,[37] (b) whether there will be a primary runoff[38] or a partisan or nonpartisan ballot,[39] (c) the geographical area within the city from which the selection is to be made,[40] (d) the time for holding the election[41] and (e) the number of elections to be held.

---

spouse's claim for damages was preserved by the injured party's notice of claim which substantially complied with the Act. The opinion notes that while the city's notice-of-tort-claim form provides space for the identification of persons claiming a derivative loss, *the city may not enlarge the Act's requirements either by its more detailed notice form or by ordinance provisions.*

**35.** The Legislature's recognition of the fundamental-law uniformity mandate *is clearly reflected* in the State election code [Code]. 26 O.S.1991 §§ 1–101 et seq. Title XIII of the Code provides that *all* municipal elections are to be conducted by the county election board (26 O.S. 1991 § 13–101) and must be held at the same place and in the same manner prescribed for the conduct of state and county elections unless otherwise provided by law (26 O.S.1991 § 13–103(A)). The terms of 26 O.S.1991 § 13–101 provide in part:

"* * * All municipal elections conducted in the State of Oklahoma shall be conducted by the county election board of the county . . . unless otherwise provided by law."

**36.** The terms of Art. 3, § 2, Okl. Const., provide in part that:

"The Legislature shall create a State Election Board to be charged with the supervision of such elections as the Legislature shall direct. * * *."

The Legislature implemented its heavy responsibility for uniformity by giving the Secretary of the State Election Board "general supervisory authority" over the county election boards. The pertinent terms of 26 O.S.1991 § 2–107 are:

"The Secretary of the State Election Board shall be the administrative officer of the State Election Board and shall have *general supervisory authority over the several county election boards*. . . . The Secretary may promulgate, repeal or modify such rules or regulations as he deems necessary to facilitate and assist in achieving and *maintaining uniformity in the application, operation and interpretation of the state . . . election laws and a maximum degree of correctness,* impartiality and efficiency in the administration of the election laws; * * *" (Emphasis added.)

**37.** *Blinn v. Hassman,* 162 Okl. 1, 18 P.2d 881 (syllabus 1) (1933); *Oklahoma City v. Century Indemnity Co.,* 178 Okl. 212, 62 P.2d 94, 98 (1936).

**38.** *State ex rel. Short v. Callahan,* 96 Okl. 276, 221 P. 718, 719 (1924).

**39.** 26 O.S.1991 § 13–103(B).

**40.** 26 O.S.1991 § 13–107.

**41.** *Lackey v. State ex rel. Grant,* 29 Okl. 255, 116 P. 913 (1911).

Charter provisions,[42] which have the force of a city's fundamental law,[43] supersede state law *only* when they affect a subject that is deemed to lie exclusively within municipal (or local) concern.[44] All conflicting charter provisions must yield to the State's Constitution and to the general laws which govern *state functions.*[45] *Nonuniform regulation of the conduct of elections is plainly, absolutely and unequivocally interdicted by the command of our fundamental law.*[46] *In the face of Art. 5, § 46 and Art. 3, § 5, the Legislature, much like city charters, is powerless* to delegate the core function of election conduct to entities other than the county election boards. These boards must conduct elections in the manner prescribed by uniform state law.

Extant jurisprudence, *Lackey v. State ex rel. Grant*[47] and *State ex rel. Short v. Callahan,*[48] deals with the manner in which an official is to be selected for a municipal office. *Lackey* teaches that a city charter

supersedes conflicting statutes that fix the time for holding city elections. Similarly, in *Callahan* we held that the framers of the constitution did not intend for the mandatory primary system[49] to infringe upon the constitutional grant of power to charter cities. For charter-governed cities the time of an election and the inclusion of primary balloting events are matters solely of municipal concern.

Another cogent reason tends to support the notion *that election contests are a state function. Challenges to the election returns lie solely within state-court jurisdiction.* The provisions of Art. 7, § 1, Okl. Const.,[50] and of the state statutes implementing them, limit municipal-court cognizance to nonfelonious criminal conduct.[51] Lacking both constitutional and statutory authority, a city would be utterly powerless to afford a municipal-law remedy for major and serious election conduct infractions, irregularities or fraud.

**42.** A city charter draws its legal vitality from Art. 18, § 3(a), Okl. Const., and from the implementing provisions of 11 O.S.1991 § 13–101. The terms of Art. 18, § 13(a), provide in pertinent part:

"Any city containing a population of more than two thousand inhabitants may frame a charter for its own government, *consistent with and subject to the Constitution and laws of this State,....* Upon such approval it shall become the organic law of such city and supersede any existing charter and all amendments thereof and all ordinances inconsistent with it. * * *" (Emphasis added.)

**43.** *Lee v. Norick,* Okl., 447 P.2d 1015, 1018 (1968).

**44.** *Oliver v. City of Tulsa,* Okl., 654 P.2d 607, 609 (1982); *Farmer v. City of Sapulpa,* Okl., 645 P.2d 518, 520 (1982); *Lee, supra* note 43 at 1018; *Walton v. Donnelly,* 83 Okl. 233, 201 P. 367, 369 (1921).

**45.** *City of Pryor Creek v. Public Service Co. of Okl.,* Okl., 536 P.2d 343, 346 (1975); *City of Sapulpa v. Land,* 101 Okl. 22, 223 P. 640, 645 (1924).

**46.** Art. 5, § 46, Okl. Const., *supra* note 22; *Prudential Property & Cas. Co., supra* note 26 at 1251 (Opala, J., concurring).

**47.** *Supra* note 41.

**48.** *Supra* note 38.

**49.** For the mandatory primary system, see Art. 3, § 3, Okl. Const. Before the constitution's amendment in 1978, these provisions were found in Art. 3, § 5, Okl. Const.

**50.** The terms of Art. 7, § 1, Okl. Const., provide in pertinent part:

" * * * Municipal Courts in cities or incorporated towns shall continue in effect and shall be subject to creation, abolition or alteration by the Legislature by general laws, but *shall be limited in jurisdiction to criminal and traffic proceedings arising out of infractions of the provisions of ordinances of cities and towns or of duly adopted regulations authorized by such ordinances."* (Emphasis added.)
At common law there was no right to contest an election. *Wagoner County Election Board v. Plunkett,* Okl., 305 P.2d 525, 529–530 (1956). The statutory contest procedure affords the exclusive remedy. 26 O.S.1991 § 8–109, *supra* note 4.

**51.** The terms of 11 O.S.1991 § 14–111 provide in pertinent part:

" * * * B. Cities having a municipal criminal court of record ... *shall not have authority to enact any ordinance making unlawful an act or omission declared by state statute to be punishable as a felony.* * * *
C. Municipalities having a municipal court not of record ... *shall not have authority to enact any ordinance making unlawful any act or omission declared by state statute to be punishable as a felony.* * * *" (Emphasis added.)

Our own jurisprudence, no less than legislative enactments or a city charter,[52] must faithfully conform to the fundamental law's prohibition against nonuniform election conduct laws.[53] We therefore hold that the respondent trial judge did not err in concluding that the time for filing a protest against the outcome of a city election must be uniform throughout the state and is governed by the three-day statutory time limit.[54]

## SUMMARY

Section 7 of the Charter cannot be construed as contrary to the statutory procedure for filing an election protest. There is nothing in the text of § 7 from which the court can infer that the drafters intended to confine an election protest to two days. The State has a *nondelegable duty* to control the election-return process. The responsibility for the conduct of elections is reposed in county officials designated under state law and is subject to the supervisory power of the Secretary of the State Election Board. Uniformity in the conduct of elections for a corruption-free canvass is plainly mandated by Art. 3, § 5 and Art. 5, § 46, Okl. Const. The general election laws that govern protests are but vitalizing and implementing provisions of the constitution's command, which serve to eliminate offending disparities in the state's election machinery. They are intended to guarantee and assure a free and equal access to the ballot. The state-regulated process, which is designed to provide an orderly procedure for the conduct of elections, *includes challenges to the announced returns.* Insofar as § 7 of the City Charter may be viewed as an attempt to regulate the ballot-challenging process, *it is inefficacious as a local and special nonconforming legal norm that stands con-*demned by the § 46 command for state-wide uniformity of election-conduct regulations. Our own jurisprudence, no less than legislative enactments and city charters, must faithfully conform to the fundamental law's prohibition against nonuniform procedure for challenging municipal elections.

Respondent Cornett's failure explicitly to press for the applicability of Art. 3, § 5 and Art. 5, § 46 is no impediment to our *sua sponte* invocation of the controlling constitutional commands. The public-law character of the controversy leaves us totally free to change or modify the legal underpinnings for the respondent trial judge's decision.[55]

## ORIGINAL JURISDICTION ASSUMED; WRITS OF PROHIBITION AND MANDAMUS DENIED.

SIMMS, HARGRAVE, ALMA WILSON and KAUGER, JJ., concur.

HODGES, C.J., LAVENDER, V.C.J., and SUMMERS and WATT, JJ., dissent.

SUMMERS, Justice, dissenting.

The contest filed in this municipal election is not governed by the statutory period for contests generally applicable to other types of elections provided by statute. I conclude that neither Article III nor Article V of our State Constitution require the result reached by the majority. The majority's argument that interweaves the suffrage provisions of Article III to the anti-local law provision of Article V so as to require a uniform procedure for local elections is not a novel argument, and was rejected by courts more than a century ago. Thus, I respectfully dissent.

---

**52.** *City of Tulsa v. Adams, supra* note 32.

**53.** Art. 5, § 46, Okl. Const., *supra* note 22; *Henry, supra* note 26 at 1271 (Opala, V.C.J., concurring).

**54.** The general election statute, 26 O.S.1991 § 8–109, *supra* note 4, authorizes a three-day period for filing an election protest.

**55.** In public-law cases we are free to apply that theory which correctly disposes of the dispute. *Reynolds v. Special Indem. Fund,* Okl., 725 P.2d 1265, 1270 (1986); *Burdick v. Independent School Dist.,* Okl., 702 P.2d 48, 54 (1985); *McCracken v. City of Lawton,* Okl., 648 P.2d 18, 21 n. 11 (1982); *Application of Goodwin,* Okl., 597 P.2d 762, 764 (1979); *Special Indemnity Fund v. Reynolds,* 199 Okl. 570, 188 P.2d 841, 842 (1948).

The majority claims that a municipal election is a "core state function" and that the election is "an exclusive nondelegable state function conducted by county election boards under the supervisory authority of the Secretary of the State Election Board", and that the election is in the hands of the State.[1] I disagree.

In 1911 an argument was made to this Court that the Charter of the City of Oklahoma City was subservient to Legislative enactments that provided for the time and conducting of elections. It was argued that Okla. Const. Art. III § 4[2] mandated such a result. In *Lackey v. State ex rel. Grant*, 29 Okl. 255, 116 P. 913 (1911) the Court said:

> Counsel for relators urge that the portion of the foregoing section [Okla. Const. Art. III § 4] which provides that the Legislature shall provide the time of holding and conducting all elections, includes all elections held in municipal corporations, both special and general; and that since section 4 by its terms imposes a mandatory duty upon the Legislature to provide the time of holding such elections, that it precludes the power and right of any other body to fix a time for such elections.

*Id.* 116 P. at 918.

We then expressly stated that the Legislature's duty under § 4 to provide for the time of holding and conducting elections applied only to elections held throughout the state, and not to municipalities.

Without determining whether, if section 4 did impose such duty upon the Legislature, the time of such elections could be fixed in any other manner than by an act of the Legislature, we are of the opinion that *said section does not make it the mandatory duty of the Legislature to provide the time of holding elections in municipal corporations*. Said section deals with three subjects: First. It provides that the Legislature shall create an election board. Second. That it shall provide the time and manner of holding and conducting all elections. Third. For the election by direct vote of the people of United States Senators, when the federal Constitution shall permit the same to be done. It is clear that the first and third objects intended to be accomplished by this section pertain to elections to be held throughout the state. It does not provide that the Legislature shall create election boards, but that it shall create "an election board." The board here contemplated is a state board, under whose supervisions the elections of the state shall be conducted; and *we think the second clause likewise has reference only to elections held throughout the state*, and that would fall under the supervisions of said election board. *Id.* 116 P. at 918–919. (Emphasis added).

This Court thus determined in 1911 that the duty of the Legislature under Okla. Const. Art. III § 4 in providing for the time and manner of holding elections did not apply to the municipalities in general and

1. With regard to characterizing a municipal election as a "core state function" I must note the following. A municipal election is required by statute to be paid for by municipal funds paid to the county election board. 26 O.S.1991 § 13–111. In *State ex rel. Jordan v. City of Bethany*, 769 P.2d 164 (Okla.1989) this Court ordered a District Court to enter judgment on behalf of three municipalities challenging a statutorily required "cost-sharing" imposed on the municipalities for the support of a state function. *Id.* 769 P.2d at 167. They challenged a statutory fee required to be paid to the Chief Medical Examiner for autopsies resulting from unexplained deaths occurring in the municipalities. This court reasoned that the cost-sharing imposed by the statute was unconstitutional because the Chief Medical Examiner performed a state service. My view is that a County Election Board *is* authorized to charge a municipality for conducting a municipal election, because the local election is not a state function, and serves a local municipal purpose and function. I decline to join an opinion that casts a legal shadow over the funding of municipal elections.

2. The current version of Okla. Const. Art. III § 4 states:

> The Legislature shall prescribe the time and manner of holding and conducting all elections, and enact such laws as may be necessary to detect and punish fraud in such elections. The Legislature may provide by law for the registration of electors throughout the state and, when it is so provided, no person shall vote at any election unless he shall have registered according to law.

to the City of Oklahoma City in particular. As explained in *Lackey* the Legislature was to create a State Election Board "under whose supervision the elections of the state shall be conducted", but that such supervision does not turn a municipal election into a "state" election. In Art. III § 4 the phrase "and shall provide the time and manner of holding and conducting *all elections*" was construed as not including municipal elections. (Emphasis added).

The majority's construction of Art. III § 5 is correct in part but I disagree with its conclusion. Uniformity of election regulations between state and local elections is not constitutionally mandated. The constitution provides that all elections shall be free and equal.[3] In *Atwater v. Hassett,* 27 Okl. 292, 111 P. 802 (1910) the Court explained the history of this provision by citing to opinions from other jurisdictions because of their similar constitutional provisions. *Id.* 111 P. at 804. Two of these opinions are noteworthy: *Patterson v. Barlow,* 60 Pa. 54 (1869) and *People ex rel. Grinnell v. Hoffman,* 116 Ill. 587, 5 N.E. 596, 8 N.E. 788 (1886). In *Patterson* the court explained that diversity, rather than uniformity, may be required to provide a free and equal election.

A free and equal election is the end, regulations to attain it are the means. If the end be attained, it is evident no question of constitutional law can arise on the uniformity or diversity of the regulations by which the end is reached. Of necessity, laws passed to promote a given object, must be controlled or modified by the circumstances surrounding the object, and must be framed to meet the exigencies standing in the way of the end to be reached. *If uniformity of regulation be unsuited to different localities, the end must be attained by diversity.* If in one part of the state a system secures to electors a free and equal election, but fails to secure it in another part because of the different circumstances, what principle of constitutional law makes it unlawful to enact other provisions to counteract the circumstances, and secure the true purpose of the Constitution? *Good sense, good order and sound morality require this diversity of regulation when it secures the end; and it is a great fallacy to substitute uniformity of regulation for a free and equal election.*

*Patterson v. Barlow,* 60 Pa. 54, 76 (1869). (Emphasis added). Later the same court stated *"that uniform regulations are not enjoined [or required] by the Constitution is beyond all dispute." Id.* 60 Pa. at 78. (Emphasis and explanation added). This concept was explained in the context of a "local or special law" challenge in *People ex rel. Grinnell v. Hoffman,* 116 Ill. 587, 5 N.E. 596, 8 N.E. 788 (1886):

It is said that the law is in conflict with that clause in the bill of rights which provides that "all elections shall be free and equal." Const. art. 2, § 18. In order to support this position, it is assumed that the word "equal" means the same as the word "uniform," and it is then argued that, inasmuch as the cities, towns, and villages which adopt the law will conduct elections according to *its* provisions, while those which do not adopt it will conduct them according to some other and different provisions, therefore there will be no uniformity, and in consequence no freedom or equality. *The declaration in the bill of rights that all elections must be equal does not necessarily mean that there must be uniformity of regulation in regard thereto in all portions of the state. That the definition of "equal elections" does not include and involve the idea of uniformity in regulation is apparent from the considerations already presented upon the question of whether the law is general or special.* It being the settled policy in this state, both under the constitutions of 1848 and of 1870, that general

---

3. Okla. Const. Art. III § 5 states:
   All elections shall be free and equal. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage, and electors shall, in all cases, except for treason, felony, and breach of the peace, be privileged from arrest during their attendance on elections and while going to and from the same.

laws, whether upon the subject of elections or upon any other subject, may be in force in localities which vote to accept them, though not in force in localities which do not vote to accept them, it necessarily follows that there will be a want of uniformity between the law in force in the adopting locality and the law in force in the non-adopting locality.

Elections are free when the voters are subjected to no intimidation or improper influence, and when every voter is allowed to cast his ballot as his own judgment and conscience dictate. Elections are equal when the vote of every elector is equal in its influence upon the result to the vote of every other elector; when each ballot is as effective as every other ballot. Where an election for or against the same candidates, or for or against the same measure, takes place on the same day, in two different cities of the state, the fact that in one city the election officers make their returns to the city clerk, while in the other the returns are made to the county clerk, cannot possibly make any difference in the freedom or equality of the election. Cooley, in his work on Constitutional Limitations, classifies the provisions which usually occur in bills of rights. He places the declaration that "all elections shall be free and equal," along with the declaration that "all freemen are equal," in the first class of such provisions which he denominates "those declaratory of the general principles of republican government." Cooley, Const. Lim. 45. *It was never heard of as a general principle of republican government that the mode of conducting an election, and declaring its result, in one city, village, or town of a state shall be exactly the same as the mode pursued for the same purpose in every other city, village, or town in the state. This general declaration has reference to the rights of the individual voter. It does not refer to uniformity of election procedures in different communities.*

*Id.* 5 N.E. at 600–601. (Emphasis in original and additional emphasis added).

In 1886 the Supreme Court of Illinois was able to say when construing a similar state constitutional provision that it was "unheard of" as a general principle that election procedures for municipal elections must be identical in different municipalities. The majority may, of course, listen to a voice other than that of the *Grinnell* Court, but the voice of historical interpretation long followed by this Court rejects the majority's analysis.[4]

I also disagree with the majority's conclusion that municipal charter provisions governing elections are unconstitutional as local or special laws and prohibited by Okla. Const. Art. V § 46. In *City of Pond Creek v. Haskell*, 21 Okl. 711, 97 P. 338 (1908) an argument was made that S.B. 234 [Okla.Sess.Laws 1907–1908 Chap. 31, Art. IV, at p. 378–387] was a special and local law for the opening and conducting of elections and for fixing and changing the place of elections, as its provisions applied to special elections to select county seats and not to all elections generally. *Id.* 97 P. at 341. Our first State Supreme Court, with all Justices concurring, cast aside this argument by pointing out that the election

---

**4.** Construction of the Oklahoma Constitution is to be in accord with the intent of the framers and the people who adopted it. *Draper v. State*, 621 P.2d 1142, 1145 (Okla.1980). This intent is found in the instrument itself, and courts are not at liberty to search for the meaning of a provision beyond the instrument when text of the provision is unambiguous. *Id.* 621 P.2d at 1145–1146. *See also McCurtain County Excise Bd. v. St. Louis–San Francisco Ry. Co.*, 340 P.2d 213, 216 (Okla.1959). Generally, when provisions have been adopted into the constitution that are similar to those of other states, it is presumed that the framers were conversant with, and intended to adopt the constructions of those provisions in other states. *Wimberly v. Deacon*, 195 Okl. 561, 144 P.2d 447, 450 (1943). For an example of this type of analysis see *Baker v. Newton*, 22 Okl. 658, 98 P. 931, 933 (1908). The Illinois court also determined that legislation was not a local or special law when it allowed cities to incorporate and thereby specify particular procedures for their local elections because the law applied to all cities in the state. *Id.* 5 N.E. at 599. This holding is consistent with my interpretation of 26 O.S.1991 § 13–102(6), discussed *infra*, as that statute allows a charter city to select a portion of state election law to apply by stating such in the resolution calling for the election.

law applied with equal force to all counties, and was not a special or local law. *Id.* 97 P. at 358. In other words, the Legislature could enact different legislative schemes for different types of elections, and a legislative scheme for the particular election to select county seats was not a local or special law, because of its statewide application. This view that elections could be segregated according to the type of the election for purposes of statutory regulation is also seen in the way Title 26 is organized.[5]

In *State ex rel. Short v. Callahan,* 96 Okl. 276, 221 P. 718 (1923) the City Charter of Ponca City, unlike the general state election statutes, contained no provision for a partisan primary. In a challenge to the election of city officials our Court said this:

> The nomination and election of municipal officers is a matter of purely municipal concern, which may be provided for by the charter of a self-governing city, adopted pursuant to section 329 (article 18, § 3a), Williams' Constitution. *Id.*

The Court summed up its analysis as follows:

> So in its last analysis the question for determination is whether the mandatory primary system for the nomination of elective officers is such a matter of grave state concern that it cannot be dispensed with and *another method* adopted *by charter in* nominating *and electing* the purely municipal officers of a self-governing city.

*Id.* 221 P. at 719. (Emphasis added).

The Court went on to hold that the statewide election laws in controversy could not prevail over charter provisions to the contrary in the nomination and election of municipal officers.

In this case I discern no evidence showing such grave state concern as to require a three-day statutory contest period over a two-day charter-required period. I conclude that Art. V § 46 is not offended by a two-day protest period,[6] and that to hold otherwise would generally invalidate statutes allowing a charter city to selectively apply state law to elections.

Does the Oklahoma City Charter provide for a protest period? The majority concludes that it does not. The provision is as follows:

> Article X, Section 7 of the City Charter. Said certificate of election returns to be issued unless stayed by a timely filed application and notice of contest or challenge to correctness of the announced results, within two days next following said primary and general elections.

It states that a certificate of election returns is to be issued unless a timely protest is filed. If the section is read as counseled by respondents then the certificate could be issued upon expiration of the two day period, but before expiration of the statutory general three day protest period. In other words, the language staying the issuance of a certificate during the protest period would become meaningless if a protest were allowed after the issuance of the certificate. Judicial construction of legislative acts is based on a presumption that all of the legislative language is intended to have constitutional meaning and affect. *TRW/ Reda Pump v. Brewington,* 829 P.2d 15, 20 (Okla.1992); *Elias v. City of Tulsa,* 408 P.2d 517, 521 (Okla.1965). In giving the provision its most logical and understandable interpretation, I read it to provide that a timely filed notice of contest is one that is filed within two days next following the election.[7]

---

5. Title 26 of the Oklahoma Statutes is organized into Articles with some of these segregated according to the type of election, and these contain statutes for the particular type of election provided: Article I—State and County Elections—Political Parties, Article X—Presidential Electors, Article XI—Judicial Officers, Article XII—Special Elections, Article XIII—Municipal Elections, Article XIIIA—School District and Vocational–Technical School District Elections, Article XX—Presidential Preference Primary.

6. *Lackey v. State ex rel. Grant, supra; State ex rel. Short v. Callahan, supra; City of Pond Creek v. Haskell, supra; People ex rel. Grinnell v. Hoffman, supra; Patterson v. Barlow, supra.*

7. This construction of the City Charter matches the statutory scheme for contests governed by the state statutes. The three-day statutory period for filing contests provided by § 8–109 harmonizes with the duty of an Election Board to not issue election certificates or lists in certain

Mr. Cornett's reliance upon the Charter provision of Article X § 5 is misplaced. That provision states:

Section 5. General Election Laws Applicable. *Except as in this Article X provided,* in said primary election for the nomination of the Mayor and the Councilman and in the general election and canvass of returns and all other proceedings whatever relating to said elections, either primary or general, *the general laws of this State applicable to municipal elections* and primaries *are hereby adopted* and put into full force and effect with the further exception and proviso that on the primary and general election ballots no party emblem or party designation shall appear and the names of all nominees who are required to be on the ballot shall appear in one column. (Emphasis Added)

Even apart from the "[e]xcept as in Article X provided" language, this section has an important limitation on the application of state laws to the election process: "the general laws of this State applicable to municipal elections and primaries are hereby adopted." This section does not state that the general laws *are* applicable, but rather that *those applicable* are adopted. What are the general laws applicable to municipal elections?

Title 11 O.S.1991 § 16–104 states that "The laws applicable to general elections shall govern general municipal elections except as otherwise provided." The "otherwise provided" comes into play by § 16–102, which provides:

The provisions of Section 16–101 et seq. [including § 16–104] of this title *shall not apply to any municipality which is governed by charter;* provided, that in any election such a municipality may, by indicating in its resolution calling the election, choose to follow any provisions of state law governing elections conducted by a county election board when the municipality's charter or ordinances are silent on the matter addressed by such provision.

11 O.S.1991 § 16–102(A). (Citation and emphasis added).

The City of Oklahoma City is a Charter City. Thus, those provisions of state law made applicable to municipal elections under Chapter 16 of Title 11 do not apply to the City of Oklahoma City.[8]

The statutory three-day period provided by 26 O.S.1991 § 8–109 and relied upon by the respondents does not contain any language making its provisions applicable to a municipal election, and it is located in Article VIII of Title 26 of the Oklahoma Statutes. Title 26 does contain an Article titled "Municipal Elections", Article XIII of Title 26. But Article XIII does not expressly provide for election contests or require that the general election laws are made applicable to municipal elections. The latter omission is significant, because in Article XIII–A involving school district and vocational-technical school district elections, the legislature did provide that "Except as otherwise provided by law, the general election laws shall apply to all elections for school districts and vocational-technical school districts." 26 O.S.Supp.1992 § 13A–101. Similar statutes are found in Article XII for specified special elections that do not include municipal elections. 26 O.S.1991 § 12–104, 12–109, 12–114, 12–117. Failure to expressly make the general election laws

---

elections before the expiration of the time to contest those elections. 26 O.S.1991 §§ 8–106, 8–108. The comparable provision of § 8–106 for a municipal election is codified at 26 O.S. 1991 § 13–106. The time to certify the results for a municipal election is "[a]t the time prescribed by law", and is not statutorily linked to a specific time corresponding to election contests. *Id.* Thus, just as the scheme for state elections prohibits the issuance of lists and certificates prior to the expiration of the contest period my interpretation of the City Charter is that it too intends a scheme of municipal elections where the issuance of lists and certificates

will not be issued prior to the expiration of the contest period.

**8.** I note that Chapter 16 of Title 11 also provides for municipal election contests and the filing of a petition alleging irregularities within a post-election three-day period. 11 O.S.1991 §§ 16–310, 16–312. Sections 16–310 and 16–312 are part of the Oklahoma Town Meeting Act, and that Act applies to municipalities of a specified population and that are *not governed by charter.* 11 O.S.1991 § 16–302.

applicable to municipal elections certainly supports this finding of an intent not to do so.

A statutory requirement making all of the general election laws applicable to municipal elections is not needed, since Article XIII does state that the notice of a municipal election "shall contain the following facts: ... 6. For charter cities where the charter is silent, indication of any portion of state law, which will apply; ..." 26 O.S.1991 § 13–102(6). See also 11 O.S.1991 § 16–102(A), quoted above, and providing for application of state law via the resolution calling for the election.[9] Because I conclude that the City Charter provides for the time to file election contests, § 13–102 does not apply, but it is important to an understanding of why the respondent's reliance upon § 13–103 is not quite correct.

The respondents rely upon 26 O.S.1991 § 13–103. Part A of § 13–103 states that "All municipal elections shall be held at the same place and in the same manner prescribed for conduct of state and county elections unless otherwise provided by law." Part C of § 13–103 states in part "Except as otherwise provided by law, the laws governing state and county Primary and General Elections shall be applicable to all municipal election." Section 13–103 refers to partisan elections, location of precincts, the time the polling places will be open, and the composition of the precinct election board. It controls the manner the election is held, but does not deal with the procedure for bringing an election contest. If § 13–103 required the application of all general election laws to charter cities then § 13–102(6) would be an ineffectual redundancy and § 13–109 a meaningless statutory appendage. Section 13–109 states:

> Municipalities operating under a charter form of government shall be required to furnish a copy of said *charter, as it applies to conduct of elections,* to the county election board of the county wherein said municipality's central offices are located. Any changes in a charter, as it applies to conduct of elections,

shall be provided immediately to the appropriate county election board. (Emphasis added).

The Legislature thus understood that a provision of a city charter could control some aspect of conducting a municipal election, and that the appropriate County Election Board would be need to be informed of such. Thus I decline to adopt the respondent's interpretation of § 13–103.

Our Constitution has given Oklahoma City the right to conduct its municipal affairs free from the control of the Legislature. Okla. Const. Art. 18 §§ 2, 3; *State ex rel. Short v. Callahan, supra.* Furthermore, the Legislature has not seen fit to place a law on our books, at this time, to expressly limit the period available for protest of a municipal election. There is no charter v. statute controversy; the statutes are silent on the subject. I would hold that the City Charter is the controlling law in this municipal election contest, and that under Article X § 7 the time allowed to file a contest to an Oklahoma City Council election is within two days after the election. The contestant was a day late.

I am authorized to state that Chief Justice HODGES and Vice Chief Justice LAVENDER join in these views.

WATT, Justice, dissenting.

I dissent. The opinion adopted by the majority today will send shock waves through municipal hallways across this state in every Charter city and town. Where reason once prevailed, chaos now reigns.

This is a simple case in the final analysis. The contestant had two days under Oklahoma City's Charter within which to protest the election results. Because he waited three days, contestant's contest came too late. A certificate of election should issue to petitioner, Sheila G. Simpson.

---

**9.** A statutory exception to the application of state law to elections in charter cities is not new. For an example see Okla.Sess.Laws 1910– 1911, ch. 136, 316, 317, and its subsequent codification in a statute providing for the time of municipal elections. C.O.S.1921 § 4369.