1998 OK 107

Richard W. FREEMAN, Jr., Petitioner,

v.

The STATE ELECTION BOARD OF
the STATE OF OKLAHOMA,
Respondent.

No. 91823.

Supreme Court of Oklahoma.

Oct. 27, 1998.

As Corrected Nov. 17, 1998.

Clyde A. Muchmore, Harvey D. Ellis, Paige S. Bass, Crowe & Dunlevy, Oklahoma City and James F. Howell, Midwest City, for Petitioner.

Neal Leader, Senior Assistant Attorney General for Respondent; and Lana Jeanne Tyree, Oklahoma City, for Contestant Tom Petuskey.[1]

WATT, Judge.

¶ 1 The facts relevant to this matter are undisputed. Richard W. Freeman is a long-time district judge in Oklahoma County. He has served for many years in District 7, Office 7. On July 6, 1998, the first day of the filing period, Richard W. Freeman filed for re-election with the State Election Board, as he had done in previous elections. Two days later, a few minutes before the time for filing for office expired, at 5:00 p.m. on July 8, 1998, Richard W. Freeman's son, Richard W. Freeman, Jr., also filed for the office held by his father. On July 10, Richard W. Freeman filed a formal withdrawal of his candidacy with the State Election Board, leaving his son as the sole remaining candidate for the judgeship. For the reasons spelled out in this opinion, we hold that the State Election Board correctly decided that Richard W. Freeman, Jr. was not a qualified candidate for the office held by his father, Richard W. Freeman. Thus, the office held by Richard W. Freeman will be vacant when Richard W. Freeman's term is completed or Richard W. Freeman leaves office, whichever first occurs.

¶ 2 Several weeks before the filing period opened, apparently during the week of June 8, 1998, Richard W. Freeman, Jr. discussed with Lance Ward, Secretary of the State Election Board, whether he should file a "preliminary declaration of candidacy" because of the similarity his name bore to his father's. A potential candidate whose name is similar to an incumbent's name must file a preliminary declaration of candidacy "on Friday of the third week prior to the beginning of the regular filing period" under 26 O.S. 1998 § 5-107.[2] The statute requires that the

1. Petuskey is not a party to this original action. Consequently we will consider his brief as that of an amicus. He had standing, however in the contest before the State Election Board under 26 O.S.1991 § 5-188, which provides:

    ... In the event only one candidate files for an office, a petition contesting the candidacy may be filed by any registered voter who is eligible to vote for the candidate.

2. Title 26 O.S.1998 § 5-107 provides:

    No person may become a candidate for any office enumerated in Section 5-102 of this title whose name is identical to the name of the incumbent or of any publicly announced candidate for such office, or similar thereto, where it appears that the identity or similarity of names is used for the purpose of confusing the voters.

    Any person desiring to become a candidate for one of said offices whose name is identical or similar to the name of the incumbent or of any publicly announced candidate for said office shall observe the following procedure.

    The potential candidate shall file a preliminary declaration of candidacy with the Secretary of the State Election Board between the hours of 8 a.m. on Monday and 5 p.m. on Friday of the third week prior to the beginning of the regular filing period. The preliminary declaration of candidacy shall be accompanied by a cashier's or certified check in the amount of Two Hundred Fifty Dollars ($250.00).

    When such a preliminary declaration of candidacy is filed the Secretary of the State Election Board shall immediately set the matter for hearing and shall cause at least five (5) days' notice to be given by publication in one issue of a newspaper of general circulation in the state so that any person may object to said filing and be heard thereon at said hearing.

    At said hearing the candidate may present proof and testimony of his good faith. The burden of proof shall be upon the candidate to show

State Election Board set for hearing the issue of the good faith of the candidate's use of a name that is the same as or similar to the incumbent's name. The State Election Board is required to give at least five days publication notice of the hearing. Mr. Ward told Richard W. Freeman, Jr. that he would have to make his own decision as to whether § 5–107 applied to him.

¶3 On Friday, June 19, which was the Friday of the third week prior to the beginning of the regular filing period, Richard W. Freeman, Jr. wrote to Mr. Ward, the State Election Board Secretary, informing him that he would not file a preliminary declaration of candidacy because he had concluded that the purpose of the statute was to prevent confusion of the voters and "my sole purpose in using my given name is not to confuse the voters but instead is to use the name by which I was admitted to the Oklahoma Bar Association ...."

¶4 It is immediately apparent that had Richard W. Freeman, Jr. complied with § 5–107, his intention to file for the judgeship held by his father would have become public knowledge on June 19, more than two weeks before the filing period closed. By not filing a preliminary declaration of candidacy Richard W. Freeman, Jr. did not publicly disclose his intention to file for the office held by his father until minutes before the filing period ended, at 5:00 p.m. on July 8. Thus, others who might have had an interest in running for district judge were left with the impression that the incumbent, Richard W. Freeman intended to seek reelection and was on the ballot unopposed. If Richard W. Freeman, Jr. had filed a preliminary declaration of candidacy, however, others interested in running for district judge would have learned more than two weeks before the filing period opened that Richard W. Freeman's own son intended to run for Richard W. Freeman's office.

¶5 After Richard W. Freeman withdrew his candidacy on July 10, Tom Petuskey, who is the former Court Clerk of Oklahoma County and a qualified elector in Oklahoma County, filed a petition before the State Election Board contesting Richard W. Freeman, Jr.'s candidacy. Petuskey claimed that Richard W. Freeman, Jr. was not a qualified candidate for the office held by Richard W. Freeman because Freeman failed to file a preliminary declaration of candidacy under § 5–107.

¶6 The State Election Board held a hearing on Petuskey's contest on July 14, 1998 and voted two-to-one to strike Richard W. Freeman's name from the ballot. In its Findings and Order, dated August 28, 1998, the State Election Board made the finding and conclusion "That Mr. Petuskey's petition be sustained and that Mr. Richard W. Freeman, Jr.'s name be removed as a candidate for district judge, District 7, Office 7."

## DISCUSSION

¶7 The sole issue before us is whether Richard W. Freeman, Jr.'s failure to file the preliminary declaration of candidacy three weeks before the filing period opened, required by § 5–107, disqualified him from filing a declaration of candidacy during the filing period. We assume original jurisdiction and hold that the State Election Board correctly determined that Richard W. Freeman, Jr.'s failure to comply with § 5–107 disqualified him from filing a declaration of candidacy during the filing period.

¶8 Our decision here takes on added importance compared to one made in the usual contest-of-candidacy case, as it does not merely determine whether Richard W. Freeman, Jr.'s name will appear on the ballot. Our decision instead determines whether the office held by Richard W. Freeman is vacant, or whether Freeman will become a district

that his candidacy is in good faith and is not intended to confuse the voters.

After a full and complete hearing the State Election Board shall render its decision, and if it finds that he is acting in good faith and not for the purpose of confusing the voters, said candidate shall be permitted to file a declaration of candidacy during the regular filing period, and

his deposit shall be returned to him. If the Board finds that said candidate's candidacy is designed for the purpose of confusing the voters, he shall not be permitted to file as a candidate, and the balance of his deposit, after the costs of the hearing are deducted, shall be returned to him.

judge, with a four year term, having been neither elected by the voters nor selected through the judicial nominating process.

*The Cases Relied upon by Freeman do not Support his Claim that His Constitutional Rights Have Been Abridged*

■ ¶ 9 Freeman argues that his constitutional rights have been denied him as a result of having been denied ballot access because of his failure to comply with § 5–107. We disagree. Freeman cites *Burns v. Slater*, 1974 OK 139, 559 P.2d 428, for the proposition that the right to run for office is a valuable one guaranteed to those who meet constitutional and statutory requirements. This is true. Nevertheless, in *Burns* we upheld the action of the State Election Board, which had denied Burns access to the ballot.

¶ 10 Freeman cites *Libertarian Party v. Oklahoma State Election Board*, 593 F.Supp. 118 (W.D.Okla.1984), for the proposition that restrictions on ballot access affect voters because the rights of voters are not easily separable from those of candidates seeking public office. While we agree that this is the law, we find *Libertarian Party* inapposite to the issues before us. There, a federal district court held unconstitutional the requirement that before a political party could obtain a spot on the ballot it was required to obtain signatures equal to five-per-cent of the voters in the previous election. Not only is the purpose of the five-per-cent law (limiting the number of political parties) unrelated to the purpose of § 5–107 (confusing voters), *Libertarian Party* was questioned in *Populist Party v. Herschler*, 746 F.2d 656 (10th Cir.1984). In *Populist Party*, the court of appeals observed that in an earlier opinion it had approved the Oklahoma five-per-cent signature requirement, but that the district court had not cited the earlier case in its *Libertarian Party* opinion.

¶ 11 Freeman also cites *Mathews v. State Election Board*, 1978 OK 113, 582 P.2d 1318, in which we struck down the two year residency requirement for district judges, based on the residency requirement for qualified electors, as unconstitutional. The basis for our opinion in *Mathews* was that the current-

ly effective constitutional provision relating to qualification for district judge did not include a residency requirement, although the constitutional provision that it replaced did have such a requirement. We expressly held in *Mathews* that nothing we said there was to be construed as prohibiting the Legislature "from imposing reasonable durational residency requirements upon candidates for district judge by statutory enactment." We see nothing in *Mathews* that supports Freeman's position here.

¶ 12 With one exception, we find inapposite the cases Freeman cites from the federal courts and the courts of other states. Those cases are: *Crussel v. Oklahoma State Election Board*, 497 F.Supp. 646 (W.D.Okla. 1980); *Anderson v. Hooper*, 498 F.Supp. 898 (D.C.N.M.1980); *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Fine v. Elections Bd. of Wisconsin*, 95 Wis.2d 162, 289 N.W.2d 823 (Wis.1980); and *People ex rel. Chicago Bar Ass'n v. Mall*, 354 Ill. 323, 188 N.E. 449 (Ill.1933). These cases variously found that the constitutional rights of candidates had been violated for various reasons. All we can discern from these cases is that neither the factual situations nor the nature of the statutes at issue in them were similar, especially to those in the case at bar.

¶ 13 One case cited by Freeman is instructive, however. In *Foley v. Donovan*, 274 Minn. 501, 144 N.W.2d 600 (Minn.1966), the Minnesota Supreme Court was faced with a factual situation somewhat similar to this case. There, Thomas Gallagher was a member of the Minnesota Supreme Court. He filed for reelection, but later withdrew his candidacy. His son, also named Thomas Gallagher, had also filed for the office his father would be leaving, as had several other candidates. After Gallagher Senior withdrew, several of Gallagher Junior's opponents filed an original action in the Minnesota Supreme Court seeking an order directing the Secretary of State to distinguish Gallagher Junior from his father on the ballot. Despite the fact that the election laws had no express provision authorizing such an order, the court ordered that the Secretary of State show on the ballot that the office for which

the parties were running was then occupied by "Thomas Gallagher (whose full name is Thomas Francis Gallagher)" and that Gallagher Junior be identified as "Thomas Gallagher (whose full name is Thomas Patrick Gallagher)." The court justified the remedy it crafted on the ground that "Our election laws are bottomed on the theory that no candidate for an office ought to be given an unfair advantage over another...."

¶ 14 We find the *Foley* opinion instructive because, whether he intended it or not, the result of Freeman's decision not to file a preliminary declaration of candidacy was to prevent other potential candidates for his father's office from learning there was a possibility that his father did not intend to seek to serve another term until it was too late for them to file. This factor makes it clear that the State Election Board's use of § 5–107 to disqualify Freeman as a candidate served to prevent any appearance of unfairness to other potential candidates for Richard W. Freeman's office who did not file and, thereby, lost the opportunity to be elected to what turned out to be a vacant office.

*Oklahoma Law Does Not Support Freeman's Claim that Applying § 5–107 to Him Deprives Him of His Constitutional Right to Equal Protection of the Law*

¶ 15 We have previously considered arguments by political candidates that election laws deprived them of their equal protection rights. In *Clegg v. Oklahoma State Election Board,* 1981 OK 140, 637 P.2d 103, we held that the equal protection rights of an unsuccessful candidate had not been violated by 26 O.S.1991 § 5–113, which requires the forfeiture of the filing fee of any candidate who does not receive fifteen per-cent of the vote. We held the forfeiture provision in § 5–113 to be constitutional because it was modest and its purpose was to limit somewhat the number of candidates on the ballot and "prevent the clogging of its election procedures to avoid voter confusion." *Clegg* at ¶ 8. Similarly, here the express purpose of § 5–107 is to avoid "confusing the voters."

¶ 16 We also rejected an equal protection argument in *Sharp v. Tulsa County Election Board,* 1994 OK 104 ¶ 19, 890 P.2d 836.

There we balanced the need for reasonable regulation of requirements for candidacy against the right of a citizen to become a candidate, and held that candidacy to public office is subject to reasonable regulation. There we said, "While the right to vote is fundamental, the right to be a candidate is not." Thus, applying the statute to Freeman's candidacy did not deprive him of his right to equal protection of the law. In balancing the rights of the public to avoid unreasonable confusion in elections, and the appearance of unfairness, against Freeman's desire to file for office under his birth name, we conclude that there was nothing unreasonable about requiring Freeman to comply with § 5–107 and make a showing of good faith reasonably in advance of the opening of the filing period.

¶ 17 We note that had Freeman filed as a candidate for any of several other judicial offices that were on the ballot, he would have had no obligation to file a preliminary declaration of candidacy. It was only because he sought the office held by his father that Freeman had to comply with § 5–107. Section 5–107 applies only to a candidate whose name is identical or similar to "the name of the incumbent or any publicly announced candidate for such office." [Emphasis added.] The statute clearly does not apply to a situation in which a candidate for one office has a name that is identical or similar to the name of an incumbent or announced candidate for a different office.

*Freeman's Failure to Comply With § 5–107 Disqualified him as a Candidate for Office*

¶ 18 In approving the State Election Board's disqualification of Freeman's candidacy, we need not rely solely on the fact that the State Election Board's ruling served to avoid the appearance of unfairness to other potential candidates for the seat held by Freeman's father. Whether or not Freeman's failure to file under § 5–107 created an appearance of unfairness, the statute clearly required Freeman to file a preliminary declaration of candidacy.

¶ 19 Freeman contends that § 5–107 does not apply to him because Richard W.

Freeman, Jr. is his birth name and not an assumed or legally changed name. The language of § 5–107, however, applies to any candidate "whose name is identical or similar to the name of the incumbent." [Emphasis added.] The word "is" as used in § 5–107 must be interpreted to include birth names, not just assumed or changed names. The wording of 26 O.S.1991 §§ 5–108 buttresses our conclusion. Under the terms of that section, which immediately follows § 5–107:

No person may become a candidate for any office who *adopts or has adopted* a name identical or similar to that of the incumbent, or of any candidate who has previously made public announcement of his candidacy for such office.

[Emphasis added.]

¶ 20 The conclusion is inescapable that § 5–107 applies to one whose name is the same as or similar to the incumbent or other announced candidate, while § 5–108 prohibits one who adopts the same or a similar name from becoming a candidate. Thus, the State Election Board correctly held that § 5–107 applied to Freeman and that his failure to file a preliminary declaration of candidacy disqualified his candidacy.

■ ¶ 21 Freeman relies on language in our opinion in *Murphy v. State Election Board*, 1959 OK ——, 203 Okla. 129, 218 P.2d 917 to support a claim that his name, Richard W. Freeman, Jr., is not similar to the incumbent's name, Richard W. Freeman. In *Murphy*, we interpreted subsection (c) of 27 O.S. 1947 Supp. § 162c which provided:

(c) Any person desiring to file as a candidate for any such [state or national] office who adopts, appropriates, uses or purloins the name of any person of State or national reputation, lining or dead, or of any hero, public official, military general, or any well-known individual or celebrity.

¶ 22 In *Murphy*, the candidate's name was R.W. Pat Murphy, and the name of the person with a statewide reputation was W.A. Pat Murphy. We held that because their names were not the same, subsection (c) of 27 O.S. § 162c did not apply because it required the names to be identical, not merely similar. In *dicta* we said that "The name

'R.W. Pat Murphy' is substantially different from the name 'W.A. Pat Murphy.'" Our *dicta* in *Murphy* applied to our interpretation of what was an identical name, and what was not. That *dicta* should not be read to avoid the conclusion that names as similar as "Richard W. Freeman," and "Richard W. Freeman, Jr.," fall within the purview of § 5–107, which is not limited to identical names, but also applies to names that are similar. We hold that the names "Richard W. Freeman," and "Richard W. Freeman, Jr." are "similar" as that term is used in § 5–107.

■ ¶ 23 Freeman also argues that to construe § 5–107 as the State Election Board did, and we have done, causes an absurd result to be reached because Freeman had no opponent when Petuskey's contest was considered. We reject this argument. By holding as it did, the State Election Board applied the clear intention of the legislature in passing the statute—requiring potential candidates with the same or similar names to incumbents or other candidates to file a preliminary declaration of candidacy three weeks before the regular filing period. The Board's ruling also avoided any appearance of unfairness to other potential candidates that would have resulted if it had issued a certificate of election to Freeman, as it would have had to do had it not disqualified Freeman under § 5–107. The appearance of unfairness factor exists only because Freeman, had he been a qualified candidate, would have had no opponent after his father withdrew. Thus the fact that Freeman would have had no opponent had he qualified as a candidate is an additional ground for applying § 5–107, not a reason for failing to apply it.

¶ 24 Title 26 O.S.1991 § 6–102, provides:

Any candidate who is unopposed in any election shall be deemed to have been nominated or elected, as the case may be, and his name will not appear on the ballot at any election in which he is so unopposed.

Freeman claims that § 6–102 demonstrates that applying § 5–107 to him would lead to an absurd result. This is not the case, however. Section 6–102 does not apply to Freeman because Freeman was never a "candidate" within the meaning of § 6–102.

Because Freeman's name was similar to his father's, he could not qualify to become a candidate without first complying with the procedures spelled out in § 5–107. He did not do so. Our conclusion is buttressed by the language of § 5–107, which refers to a person with a name similar to an incumbent's who has not filed a preliminary declaration of candidacy as a "potential candidate," not as a "candidate." Thus, Freeman never became a "candidate" as that word is used in § 6–102, or otherwise, because he failed to qualify as a candidate under § 5–107. ·

¶ 25 That Freeman might have succeeded in establishing he was not filing to "confuse the voters," at a timely hearing under § 5–107, is not a ground for refusing to declaring his disqualification now. Freeman was required to prove his good faith at a hearing on his preliminary declaration of candidacy under § 5–107. By failing to file a preliminary declaration, Freeman waived the right to prove that his filing was in good faith. Thus, he never became a qualified candidate for the office held by his father.

**JURISDICTION ASSUMED, PETITION FOR WRIT OF MANDAMUS DENIED**

KAUGER, C.J., SUMMERS, V.C.J., and HODGES, SIMMS, and WATT, JJ., concur.

LAVENDER, HARGRAVE, OPALA and ALMA WILSON, JJ., concur in result.

1. The provisions of 26 O.S.1991 § 5–107 are:

No person may become a candidate for any office enumerated in Section 5–102 of this title whose name is identical to the name of the incumbent or of any publicly announced candidate for such office, or similar thereto, where it appears that the identity or similarity of names is used for the purpose of confusing voters.

Any person desiring to become a candidate for one of said offices whose name is identical or similar to the name of the incumbent or of any publicly announced candidate for said office shall observe the following procedure.

The potential candidate shall file a preliminary declaration of candidacy with the Secretary of the State Election Board between the hours of 8 a.m. on Monday and 5 p.m. on Friday of the third week prior to the beginning of the regular filing period. The preliminary declaration of candidacy shall be accompanied by a cashier's or certified check in the amount of Two Hundred Fifty Dollars ($250.00).

When such a preliminary declaration of candidacy is filed the Secretary of the State Election

OPALA, J., with whom LAVENDER and HARGRAVE, JJ., join, concurring in result.

¶ 1 This case is *neither* about the petitioner's good intentions *nor* about his *bona fides*. It is about the legal correctness of his ballot-status loss by a ruling of the State Election Board [Board] which *disqualifies* his district judge candidacy for failure to comply with the commands of 26 O.S.1991 § 5–107.[1] That decision is now tendered for corrective relief in this original proceeding. I concur in letting the Board's disqualification stand, adding my own analysis for leaving that ruling undisturbed.

**I**

**THE ANATOMY OF THIS CONTROVERSY**

¶ 2 Petitioner's father, *whose name is Richard W. Freeman*, has been serving in Oklahoma County as a district judge in office No. 7. He sought re-election to that office on the first day of the 1998 filing period (July 6, 1998). The son (petitioner), *who bears the name of Richard W. Freeman, Jr.*, pursued the same office by filing "a few minutes before" the end of the statutory period (July 8, 1998 at 5:00 p.m.). Two days later the father formally withdrew from the race, leav-

Board shall immediately set the matter for hearing and shall cause at least five (5) days' notice to be given by publication in one issue of a newspaper of general circulation in the state so that any person may object to said filing and be heard thereon at said hearing.

At said hearing the candidate may present proof and testimony of his good faith. The burden of proof shall be upon the candidate to show that his candidacy is in good faith and is not intended to confuse the voters.

After a full and complete hearing the State Election Board shall render its decision, and if it finds that he is acting in good faith and not for the purpose of confusing the voters, said candidate shall be permitted to file a declaration of candidacy during the regular filing period, and his deposit shall be returned to him. If the Board finds that said candidate's candidacy is designed for the purpose of confusing the voters, he shall not be permitted to file as a candidate, and the balance of his deposit, after the costs of

ing the son as the only candidate for the office. The protest to petitioner's candidacy status, which rests on his non-compliance with the provisions of § 5–107, culminated in a State Election Board order that declares his filing ineffective. This proceeding followed.

## II

## IN THE SCENARIO UNFOLDED BY THIS CASE THE COMMANDS OF § 5–107 ARE INVOCABLE AGAINST THE PETITIONER'S BALLOT STATUS

¶ 3 One whose name is identical or similar to that borne by the incumbent (or by any announced candidate for the office) must declare for the anticipated race *earlier* than the regular filing period and then undergo a State Election Board inquiry to determine whether the intended candidacy "is designed for the purpose of confusing the voters". If the Board should make an affirmative finding, the candidate shall be disqualified from seeking the office. These are the provisions of 26 O.S.1991 § 5–107.

¶ 4 Petitioner did *not follow* the § 5–107 procedure. In the post-filing protest brought to declare his ballot status ineffective he fell short of convincing the Board that his candidacy was "not intended to confuse the voters". In the scenario unfolded by this case the commands of § 5–107 are clearly invocable against the petitioner's status as a candidate. He bears a name "identical or similar" to that of the incumbent (at the time of filing) and to that of another candidate for the same office—his father. Had the father announced—antecedent to the filing period—that he would not seek re-election, or had the father not filed at all, the critical proof of an intended name confusion might have been far less apparent. The father's *subsequent withdrawal* from the contest neither affects the analysis required by § 5–107 nor provides a post-factum cure for the son's failure to obey that section's command. The *statutory cloud,* once cast on a candidate's ballot status, will not be erased by an *after-occurring event. The Board's assessment of* an intend-

ed confusion, as well as its evaluation of identity (or similarity) between the names, must be measured *by the facts in existence at the time designated for the son's "preliminary declaration"*—that time is statutorily declared to be "between the hours of 8:00 a.m. on Monday and 5:00 p.m. on Friday of the third week *prior* to the beginning of the regular filing period". There is no record support for the notion that at the critical time for the Board's assessment petitioner did not anticipate his father would be a candidate for the same office. The Board's decision soundly rests on its findings that the son's filing created a potential "voter confusion", *viewed, as it must be, as of the time the preliminary § 5–107 declaration* should have been made. The prescribed statutory penalty for one who has flunked *a timely* § 5–107 *inquest* into the factum of a potential voter confusion—the offender's loss of ballot status—should not be different (or milder) when the Board is called upon to mete out the law's sanction against one who, like this petitioner, *entirely ignored* the section's command by failing to file an early declaration. Irrespective of the procedural or postural State, the loss of ballot status is *the prescribed consequence* of a candidate's filing that results in confusion caused by the same or similar names.

## III

## THE SANCTIONS IMPOSABLE BY § 5–107 ARE NOT AN IMPERMISSIBLE BURDEN ON A PERSON'S CONSTITUTIONAL RIGHT TO SEEK OFFICE

¶ 5 The State's compelling interest in an electoral process that is free from voter confusion strongly militates against ascribing any constitutional infirmity to the commands of § 5–107. The burden it casts on one's freedom to seek a public office is both reasonable and rationally related to the state responsibility for conducting elections in a manner free of corruption and confusion.[2]

## IV

### SUMMARY

¶ 6 Petitioner's candidacy was correctly subjected to the test imposable by the provi-

---

the hearing are deducted, shall be returned to him.

**2.** *Simpson v. Dixon*, 1993 OK 71, 853 P.2d 176, 183–184.

sions of § 5–107 on candidates with a name identical or similar to that of the incumbent. His loss of ballot status did not intrude upon the allowable bounds of constitutional freedom to seek a public office. Burdens on the right to become a candidate are not excessively severe—when measured by the First and Fourteenth Amendments and by the Equal Protection Clause—if they are essential to serve a compelling state interest. There must be a substantial regulation of elections if they are indeed to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.[3]

---

**3.** *American Party of Texas v. White*, 415 U.S. 767, 783, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744, n. 14 (1974); *Storer v. Brown*, 415 U.S. 724, 729, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974); *Lubin v. Panish*, 415 U.S. 709, 719, 94 S.Ct. 1315, 1321, 39 L.Ed.2d 702; see also, Dennis W. Arrow, The Dimensions of the Newly Emergent Quasi—Fundamental Right to Political Candidacy, 6 Oklahoma City University. L.Rev. 1 (1981).